Edward Bonnier, Plaintiff-Appellee, v. Chicago Burlington and Quincy Railroad Company, Defendant-Appellant.

Gen. No. 45,889.

Opinion filed June 30, 1953.

Released for publication July 23, 1953.

J. L. Rice, C. W. Krohl, Charles F. White, Robert F. Casey, Theodore Schuster, and Andrew C. Scott, all of Chicago, for appellant.

James A. Dooley, of Chicago, for appellee.

Mr. Justice Burke delivered the opinion of the court.

Edward Bonnier filed a complaint in the superior court of Cook county against the Chicago, Burlington & Quincy Railroad Company to recover damages for injuries suffered on July 30, 1948, when he was thrown from the top of a gondola carload of scrap metal during a switching operation in its Morton Park, Illinois, switch and train yard. The scrap metal shipment on which he was standing was moving in interstate commerce from a Chicago shipper to an Indiana receiver. Issue was joined. The first trial resulted in a verdict for plaintiff for $188,333.33. The second trial resulted in a verdict for $70,000. Defendant's motions for a directed verdict and for judgment notwithstanding the verdict were overruled and judgment was entered on the verdict. Defendant appeals. In a cross-appeal plaintiff asks a new trial on the question of damages, based on a claimed prejudicial error in refusing to receive the testimony of an actuary as to the present value of plaintiff's loss of future earnings computed with reference to his life expectancy.

Plaintiff was 48 years old at the time of the occurrence. He had been continuously employed by defendant as a railroad blacksmith for 19 years. He was the only blacksmith in the Morton Park yard and as such did all the blacksmithing there. He worked at a blacksmith forge located in a blacksmith shop near tracks 4 and 5 in what is known as the repair or Y yard. His routine duties involved the forging of parts for freight

38

cars such as pin lifters, stirrups, grabirons, brake levers, etc., in the blacksmith shop. When anything beyond routine work was involved, he would be directed or instructed to do it by Mr. Hosticka or Mr. Oestmann. The repairmen usually removed the defective parts from the freight cars. Plaintiff did the necessary forging and thereafter he either set the forged parts outside his shop for the repairmen, or he took them directly to the repairmen who installed the parts on the freight cars. Sometimes he went into the repair yard with pencil, ruler and paper and drew patterns of defective parts, particularly where it was difficult to remove the parts from the car. Occasionally, he was sent out to what is known as the Z yard (tracks 8 to 26 inclusive) and there drew patterns of defective parts, usually on track 15, the bad-order track, where cars with defective safety appliances were set, pending their removal to the repair yard. When directed to do so, plaintiff also went into the Z yard to assist in making repairs to "hot" cars. A "hot" car is one loaded with perishable freight, emergency war material and the like.

The blacksmith shop and forge were located within the repair yard and all the tracks within that yard were blue flagged and could not and were not switched while the blue flags were posted. On Sundays plaintiff might also work as a repairman, oiler, car inspector or in whatever other capacity he might be most useful. On Friday, July 30, 1948, plaintiff had completed all pending work at his forge in the blacksmith shop when the noon hour arrived. He ate lunch in the blacksmith shop, alone, and immediately thereafter left that shop, between tracks 4 and 5, and went to a gondola car of commercial scrap metal located about 200 feet to the north on track 15 in the Z yard. The gondola carload of commercial scrap metal was located at the east end

of track 15. There were also a number of boxcars standing on track 15, immediately west of the carload of scrap metal. All of the cars on that track were set there pending removal to the repair yard because of safety appliance defects. When plaintiff left his blacksmith shop and went to the gondola car on track 15 there were then approximately 40 cars awaiting repairs in the repair yard. There were also a number of other cars with safety appliance defects on track 15, awaiting removal to the repair yard. Plaintiff made no attempt to do any work on the 40 cars awaiting repairs in the repair yard, nor did he pay any attention to the other defective cars on track 15, the bad-order track. Although about 40 men were employed in the repair yard, plaintiff did not see any of them while walking from his shop to the gondola carload of scrap metal. He was not directed or requested to leave the blacksmith shop or the repair yard and go to the gondola car on track 15, nor did he advise anyone that he was leaving the blacksmith shop in the repair yard and going to the gondola car on track 15. When plaintiff arrived at the gondola car he examined the car on the side so as to ascertain the nature of the safety appliance defect which caused it to be placed there. After learning from the card that the car had a defective stirrup, plaintiff went to the defective appliance and drew a pattern of it with pencil, ruler and paper. After having drawn this pattern he noted from the material hanging over the side of the car that the car contained commercial scrap metal, one piece being 16″ x 12″ x ¼″ thick. He decided to climb on top of the car to get that piece of metal. Before he climbed on top of the gondola carload he · observed that there were a number of freight cars immediately west and that these cars (boxcars) were 6 or 7 feet higher than the gondola car. He also looked to the east and to the west to see if locomo-

40

tives were switching from either end of track 15, but he saw no locomotives. His vision to the west was obstructed by the freight cars standing west of the gondola car, as well as by a curve in the track.

There was a card on the side of the gondola car that showed the contents of the car were being shipped by the Doppelts Metal Company of Chicago to the Inland Steel Company of Indiana Harbor, Indiana. Plaintiff said he paid no attention to the card or to whether the shipment belonged to defendant or someone else. After plaintiff climbed on top of the gondola car, he was seen to walk the full length of the carload, apparently looking for something, and was also observed in about the middle of the car with something in his hand about 1½ feet long. Plaintiff testified that the piece of scrap metal hereinbefore mentioned was located in the southerly half of the shipment, slightly west of the center of the carload. He said he intended to use the metal plate in connection with the building of a dolly or cart. He was not making a dolly on that day. He had no instructions to make a dolly or a cart, had not built one for at least 10 months previously and the defendant needed no additional dolly or cart. While plaintiff was standing near the end of the gondola car facing in an easterly direction, some freight cars were pushed in from the westerly end of track 15, and when they made contact with the string of cars already standing on that track the impact was such as to throw plaintiff to the ground, where his right arm was severed below the elbow. The force of the impact caused the gondola car to move 5 or 6 feet. The freight cars that were shunted in on track 15 from the west were moving at the usual and customary speed of 3 to 4 miles an hour. The locomotive that was pushing the cars in from the westerly end of track 15 was more than 1,000 feet west of the gondola car on which plaintiff was standing. Defend-

41

ant's rules prohibit workmen from standing on top of freight cars, near the end thereof. Defendant's rules, with which plaintiff was familiar, provided that employees could not depend for their protection upon the ringing of bells or the blowing of whistles by switch engines in the Morton Park switch yards. The 4 tracks in the repair yard (4, 5, 6 and 7) were protected by blue flags and no switching could be done in that yard before first having the flags removed by one of the workmen. Whenever the workmen went out into the Z yard to make repairs or otherwise take a position of danger, it was their duty to notify the switch crews of that fact.

Plaintiff admits that all tracks in the Z yard, including track 15, were known as "live" tracks, and that he could expect cars to be switched in from either end of these tracks at all times. His witnesses gave similar testimony. Defendant's rules, with which plaintiff was familiar, advised plaintiff that he could expect cars to be switched from both directions at all times on these tracks without notice by bell, whistle or otherwise. He testified that he heard no bell or whistle immediately prior to the impact which threw him from the gondola car. Plaintiff claimed it was a custom not to switch cars in on any track when there was a dead locomotive located between 20 to 40 feet beyond standing freight cars. At the trial he said there was a dead locomotive standing 20 to 40 feet east of the gondola carload of scrap metal. He did not see it until after he got up on top of the gondola car. He did not claim at the trial that he had relied for his safety on the observance of the custom at the time he got up on top of the gondola carload of scrap metal. Plaintiff does not claim that defendant's switch crews knew that a dead locomotive was standing 20 to 40 feet beyond the gondola car. The custom was for the protection of defendant's locomo-

tives. No one testified that it was for the protection of employees.

 In *Tiller v. Atlantic Coast Line R. Co.,* 318 U. S. 54, the court said that the Act of 1908 and the amendment of 1939 of the Federal Employers' Liability Act leave for practical purposes only the question of whether the carrier was negligent and whether that negligence was the proximate cause of the injury, and that the employer's liability is to be determined under the general rule which defines negligence as the lack of due care under the circumstances, or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances, or doing what such a person under the circumstances would not have done. In that case the court held that the 1939 amendment of that Act had the effect of doing away with the doctrine of assumption of risk. Defendant in the instant case does not rely upon the doctrine of assumption of risk. Defendant maintains that plaintiff has failed to prove that his injuries were proximately caused by any breach of duty by it. Defendant does not seek a new trial. It maintains that the plaintiff has not made out a case. Therefore, we view the testimony, with all reasonable inferences arising therefrom, in its aspect most favorable to plaintiff. The evidence is not weighed. The question presented is whether there is any evidence fairly tending to prove plaintiff's case.

 In support of the judgment plaintiff analyzes the facts. He says that the cars were shunted in from the westerly end of track 15 in an unusual manner, that he had never seen cars shunted that way in his 19 years' experience, and that the violence of the collision was like the explosion of a bomb. Plaintiff was standing on top of the gondola car facing east and did not and could not see the cars being shunted in from the west. The cars were shunted in from the west at a

43

speed of 3 to 4 miles an hour. This was the usual and customary speed. The track along which the cars were being shunted was level for a distance of 837 feet. There were 13 or 14 cars standing on the easterly end of track 15–Z at the time the cars were shunted in from the west. These 13 or 14 cars standing on the easterly end of that track were on an upgrade of either 3/10ths or 5/10ths of 1 per cent. The effect of the impact of the 14 cars being shoved in from the west on the 13 or 14 cars standing on track 15 was to cause the gondola car from which plaintiff was thrown to move a distance of 5 or 6 feet. Plaintiff states that the car shunted in from the west ran into "standing cars upon which the brakes were not set, although the evidence showed that the brakes should have been set." This statement is not supported by the record. The sole purpose for setting brakes on a freight car after being shunted in on any of the switch tracks was to keep the car from rolling off the end of the tracks when the cars came down the hump from the east. As 13 or 14 cars were standing on the easterly end of track 15 when the 14 cars were shunted in from the westerly end of that track, and because the 13 or 14 cars were standing on an upgrade, there was no need to set the brakes either on the cars being shunted in from the west or on the cars standing on the easterly end of the track. There is no evidence that brakes should be set on cars standing on the easterly end of track 15–Z when other cars are being shunted in on that track from the west. It was explained that this was never done for the reason that track 15–Z was upgrade toward the east and there was, therefore, no tendency for cars to roll off the end of that track when the first one was shunted in from the west.

 Plaintiff states that defendant shunted in the cars from the west on track 15–Z in violation of a custom of the yard not to kick cars into a track at the

end of which there was a locomotive. The custom was designed for the protection of the locomotives and no one claimed the custom was designed for the protection of any of defendant's employees. Plaintiff and his witnesses agreed that the custom was for the protection of defendant's locomotives. Plaintiff could not name a single instance in which he had seen the custom observed. He gave one instance in which he saw a locomotive damaged where the custom was not observed. Plaintiff states that defendant "gave no warning of this extra hazardous and abnormal railroad operation and violated its own rule." The evidence shows clearly that the shunting in of the 14 cars from the westerly end of track 15–Z was neither extra-hazardous nor abnormal. The movement was at 3 to 4 miles an hour in the usual and customary way. Plaintiff relying on rule 30 of the defendant that "the engine bell must be rung when an engine is about to move and while approaching and passing public crossings and grades and through section and yard limits," says that no bell was rung when the engine started to kick the cars down. It is clear from the record that rule 30 has no application to switching movements. Defendant's rules 3, 6 and 7 were familiar to plaintiff, and their applicability had been acknowledged by him in his handwriting. Rule 7 advised him that "road and yard engines moving about in yards and on tracks not at public crossings are not required to, it is not usual, and they do not always ring bells and blow whistles." Plaintiff acknowledged that he understood that he could not "rely on such signals being given but must watch out himself for trains, cars or engines."

██ Plaintiff states that "at the time of the accident the crew had reason to expect the presence of one or more workmen (the plaintiff was one of the workmen who regularly worked upon this track) upon, between

or behind one or more of the cars shunted." This statement is not supported by the evidence. Plaintiff's regular place of duty was in the blacksmith shop and in the repair yard, each track of which was protected by locked switches and blue flags. If he intended to go into a place of danger on the cars or between the cars on track 15–Z, or any other track outside the repair yard, it was his duty to see that blue flags were posted at each end of the cut of cars or to otherwise warn the switch crew. He knew that 3 switch engines were kicking cars in both directions on all tracks, including 15–Z, throughout the 24 hours of the day. There is no testimony tending to show that the switch crew had any reason to expect that plaintiff would climb between the cars and take a dangerous position on top of the car at the end thereof, in violation of company rules, and without observing the rule with respect to blue flags and advising the switch crew. Plaintiff asserts that defendant sent him to a place to work which its own conduct had made "pregnant with danger." The record shows that defendant provided a blacksmith shop in the center of a repair yard where all tracks were protected by locked switches and blue flags, and further provided him with a set of specific rules to the effect that he was obliged to anticipate that cars would be switched from both directions at all times on track 15–Z and other similar tracks without warning of any kind or character, and that it was his duty to protect himself. There is no dispute that it was plaintiff's duty to notify the switch crew before assuming a place of danger on the gondola car. Plaintiff was not a part of the switch crew. He was not engaged in inspecting cars, repairing cars, making patterns for cars or oiling cars at the time he was injured.

 There is no support in the record for the statement of plaintiff that he usually and regularly

46

"mounted scrap cars for the purpose of taking scrap for use in defendant's business." If the statement were true he would none the less be obliged to anticipate that cars would be kicked in on all tracks in the Z yard from either end at all times and without warning. It was his duty under the rules to notify the switch crew or to blue flag the track before assuming a position of danger on the cars. At the time plaintiff was thrown from the top of the gondola car of scrap metal he was not working as a repairman, nor seeking to repair any part of any railroad car, nor was he seeking to obtain material for the purpose of repairing a railroad car, nor was he working as an oiler, yard clerk or inspector, nor seeking to oil, inspect or do the work of a yard clerk. When cars were inspected or when repairmen were working on them outside the repair yard, it was the practice to notify the switch crew or blue flag the tracks. There is no testimony that anyone regularly worked "between the cars." Clerks worked between the tracks. Plaintiff states that employees regularly crossed the track either while en route to or from one of the two neighboring parking lots or while en route to or from a luncheon shanty via a path. The path mentioned was not involved in any way in the switching that occurred on track 15–Z, and plaintiff was not traveling any such path at the time he was injured. There was no violent or unusual impact between the 14 cars shunted in and the 14 cars standing on the track, as the cars moving in traveled at the usual and customary speed of 3 to 4 miles an hour and the gondola car on which plaintiff was standing moved only 5 to 6 feet.

Plaintiff, citing *Terminal Railroad Ass'n of St. Louis v. Schorb,* 151 F. (2d) 361, states that it would be difficult to find a case more incisively pertinent. The distinction between the *Schorb* case and plaintiff's case is that (1) it was not customary to kick or shunt cars

47

in on the receiving track in the *Schorb* case, whereas, plaintiff admitted he could expect cars to be kicked or shunted in from both ends of track 15–Z at all times; (2) that plaintiff in the *Schorb* case was a switch foreman and the crew was bound to anticipate he would be in the yards at all times, whereas, plaintiff was a blacksmith and the switch crew was not bound to anticipate that he would be in the yards except when the switch crew would be first notified to that effect in accordance with defendant's rules; and (3) the switching in the *Schorb* case was at an excessive and dangerous speed of 12 to 15 miles an hour and the impact had the effect of propelling the standing car for approximately 100 feet along the track after knocking down the foreman and dragging him for a considerable distance, and thereafter the propelled car was derailed and ran for 115 to 120 feet after being derailed. In plaintiff's case the cars were kicked in at the customary and usual rate of 3 to 4 miles an hour and the car on which plaintiff was standing before he was thrown to the ground moved only 5 to 6 feet.

Plaintiff also relies on *Tennant v. Peoria & P. U. Ry. Co.,* 321 U. S. 29. In that case Tennant was a member of the switch crew and the engineer knew of his presence behind the engine in the yards. Plaintiff in the instant case was not a member of the switch crew. Defendant's rules, with which plaintiff was familiar, advised him that he could not depend upon the ringing of bells or blowing of whistles, and he admitted he understood he could not rely on such signals being given. There was evidence in the *Tennant* case that rule 30 was applicable in the switch yards where a member of the switch crew was involved. There is no evidence in the record that rule 30 was applicable to plaintiff's situation. The only witness inquired of with respect to the matter denied that defendant's rule 30 had any

application to switching movements. In the *Tennant* case plaintiff was a member of the switch crew. The engineer saw plaintiff disappear behind the locomotive, subsequently backed the locomotive in the direction in which he disappeared, with the result that he was run over and killed. The engineer owed a duty to that plaintiff to warn him that the locomotive was backing up because he saw him disappear behind the locomotive, and did not see him return before it started to back up. The locomotive was very close to that plaintiff and was the instrument which caused his death. The ringing of the bell would have furnished an adequate warning to him. Plaintiff in the instant case failed to advise anyone of his intention to leave the blacksmith shop and go into the Z yard, and the gondola car on which he was standing just before he was injured was from 1,000 to 1,500 feet east of the locomotive that was shunting in the 14 cars from the westerly end. Plaintiff was obliged to anticipate that cars would be kicked in from both ends of track 15–Z at all times and he recognized that fact. There were about 1,200 freight cars switched daily in this yard. In the *Tennant* case the Supreme Court recognized that the engineer owed a duty to the switchman, located immediately behind the engine, to warn him by ringing a bell, whereas in a situation such as plaintiff in the instant case, the court recognized that the ringing of the bell would be unnecessary as a matter of law. See *Toledo, St. L. & W. R. Co. v. Allen,* 276 U. S. 165. Plaintiff also cites *Kinzell v. Chicago, M. & St. P. Ry. Co.,* 33 Idaho 1, 190 Pac. 255. There the switching movement was made at 10 miles an hour and it was conceded by the parties that if the train had not been proceeding at a speed not to exceed a rate of 4 miles an hour, defendant would not have been negligent. In the instant case the switching movement was made at the usual and customary

49

speed of 3 to 4 miles an hour and the gondola car from which plaintiff was thrown moved only 5 to 6 feet as a result of the impact.

We agree with defendant that the case of *Chesapeake & Ohio Ry. Co. v. Mihas,* 280 U. S. 102, is applicable to the facts of the case at bar. In that case Mihas was not a member of the switch crew. Plaintiff was not a member of the switch crew. There was no custom to warn persons of locomotive movements in the *Mihas* case, nor was there such a custom in the instant case. In fact, defendant's rule required plaintiff to advise the switch crew before assuming a position of danger and this he failed to do. Plaintiff in the *Mihas* case was not directed to crawl over the couplers between the cars, and this fact is equally true of plaintiff in the case at bar. It is the undisputed testimony that plaintiff neither told anyone of his intention to climb on top of the gondola car, nor was he directed by anyone to do so. The claim that the switching movement was unusual was made in the *Mihas* case, as it is made in this case. It will be observed that in the *Mihas* case the court said (105):

"The cars being switched moved at the rate of four or five miles per hour, which was not an unusual speed for that kind of an operation. Those engaged in the movement had no knowledge of Mihas' position or of his movements."

In *Toledo, St. L. & W. R. Co. v. Allen,* 276 U. S. 165, cited by defendant, a railroad car checker was struck and injured by a shunted or kicked freight car. He based his case on the failure of other railroad employees to warn him of the approach of the shunted car, just as plaintiff bases his claim, in part, on defendant's alleged failure to warn him that cars were being kicked in on track 15 from the west end. In holding the railroad company not liable because the switch

engine crew neither knew nor had reason to know that the car checker was in a position of danger, the court commented that the shunted cars moved at a moderate speed—four to six miles an hour—made noise enough to be heard at a distance of one or two car lengths, and that "obviously the ringing of the bell when and after the cinder cars were uncoupled or when the engine started or while it was running would not have been useful as a warning to plaintiff." In the *Allen* case the court also said that in the absence of knowledge on their part that he was at a place where he was liable to be struck and obvious of that danger, "they were not required to vary the switching practice customarily followed in that yard or to warn or to take other steps to protect him." In view of the main-line trains and three switch engines constantly operating in defendant's yards, "the ringing of bells and the sounding of whistles on trains going and coming, and switch engines moving forwards and backwards, would have simply tended to confusion." There were 1,200 freight cars switched in defendant's railroad yard daily, and we agree with it that ringing a bell or blowing a whistle every time a switch movement occurred would certainly aid no one. It should be kept in mind that plaintiff was more than 1,000 feet from the locomotive which kicked the cars in from the west which precipitated him from the top of the gondola car to the ground. From a careful study of the record we find, as a matter of law, that plaintiff has failed to prove that any negligence of defendant proximately caused the unfortunate injury which plaintiff suffered.

 Defendant also insists that plaintiff cannot recover because his alleged cause of action is founded on an immoral or illegal transaction. Plaintiff answers that he is not barred from recovery because title to the piece of scrap metal which he took was in some person

other than the defendant. He states his superior directed him and other employees to take small pieces of metal from cars in the yards and that they authorized and approved the use of such pieces of metal in the yards. He asserts that the scrap metal is not shown to have had any value, that the "crime of larceny requires the elements of *scienter* and specific intent to appropriate the property to another," and that proof of these elements is lacking. Plaintiff says that whether he violated any statute is not before us on this appeal because no statute was pleaded by defendant, no instruction concerning the violation of any statute by plaintiff was tendered, and no evidence was offered in support of any such charge. Citing *Blanchard v. Lewis,* 414 Ill. 515, plaintiff states that the instant case must be reviewed and decided upon the theory upon which it was tried in the court below. Defendant states that plaintiff is guilty of three separate violations of the Federal statute prohibiting the stealing, possessing or carrying away goods moving in interstate commerce. In *United States v. De Normand,* 149 F. (2d) 622, the court said (624):

"But the statute is not framed in terms merely of larceny and its prohibitions should not be restricted to technical common-law larceny. In *White v. United States,* 2 Cir. 273 F., 517, 518, Judge Hough remarked that 'the essential object of this statute is to create, define, and punish the offense of abstracting or unlawfully having in possession goods while in interstate or foreign transit, and thereby interfering with interstate or foreign commerce.' "

It has been the policy of the courts to refuse their aid to anyone who seeks to found his cause of action upon an illegal or immoral act or transaction. This refusal to aid derives not from the consideration of the defendant, but from a desire to see that those who transgress

the moral or criminal code shall not receive aid from the judicial branch of the Government. *Hunter v. Wheate,* 289 Fed. 604; *Levy v. Kansas City, Kansas,* 168 Fed. 524; *Downing v. City of Jackson,* 199 Miss. 464; *Newton v. Illinois Oil Co.,* 316 Ill. 416. The courts will take judicial notice that the cause of action is based in whole or in part upon an immoral or illegal transaction regardless of the fact that such defense is not pleaded. *Higgins v. McCrea,* 116 U. S. 671; *Warner Bros. Theater v. Cooper Foundation,* 189 F. (2d) 825. The problem presented is not one of pleading nor the change of theory on which the case was tried below. It is a fundamental rule of substantive law that the courts will not vindicate a civil cause of action which arises out of, in whole or in part, the doing of an act prohibited by Federal criminal statutes. The rule is the same in Illinois. *Pietsch v. Pietsch,* 245 Ill. 454; *Critchfield v. The Bermudez Asphalt Paving Co.,* 174 Ill. 466. As the Federal statute making it unlawful to take, possess or carry away any article moving in interstate commerce is the law of the land, the Illinois courts are bound to uphold it.

The Federal statute does not necessarily make criminal intent an essential part of the unlawful act. The statute prohibits stealing, which of course includes a criminal intent. The statute also prohibits the unlawful taking, possessing or carrying away part of an interstate shipment for the purpose of converting it to one's own use. When one takes property from an interstate shipment, he necessarily does it unlawfully. We agree with defendant that the plaintiff could not have confused the gondola carload of commercial scrap metal with the railroad scrap car that the defendant maintained at the scrap dock for the purpose of collecting discarded scrap metal. Plaintiff knew, as a blacksmith with 19 years of railroad experience, that the

53

great bulk of loaded cars passing through the yard contained property belonging to shippers and not to defendant. Plaintiff testified: "I did not look at any other ticket, or tags, or papers on that car, nor did I attempt to ascertain who the load belonged to. I did not at any time attempt to determine whether this was a commercial car or whether it belonged to the Burlington railroad." Plaintiff cannot absolve himself from the Federal offense by ignoring obvious facts. *United States v. Balint,* 258 U. S. 250.

■■■ Since the gondola car of scrap metal had a placard on the side of it showing that it was shipped from the Doppelts Scrap Iron & Metals Co., Chicago, Illinois, to the Inland Steel Co., Indiana Harbor, Indiana, this fact alone was prima facie evidence of the ownership of the shipment and its interstate character. Plaintiff is charged with knowledge of the Federal statute and necessarily knew it was unlawful to take property from an interstate shipment. He cannot evade the prohibition of the statute by ignoring the placard on the side of the car, ignoring the fact that most carloads of materials passing through the yards belonged to shippers, ignoring the fact that the scrap metal itself was not discarded by any railroad and contained no materials that he had ever seen in the defendant's storeroom, and ignoring the fact that the contents of the car were, according to his testimony, thrown out by various companies. When plaintiff decided to climb on top of the gondola car of scrap metal, his purpose was not the doing of any blacksmith work, not the doing of any repair work, not the drawing or making of any patterns, not the oiling or inspecting of a railroad car, or the doing of any work that came within the type of work which he would do as a blacksmith, or the type of work which he did on Sundays, when he worked as a repairman, oiler and car inspector. Obviously, climb-

ing onto the top of this carload of scrap metal had nothing to do with repairing a "hot" car. For all blacksmith work other than routine work he was to receive directions from Mr. Hosticka or Mr. Oestmann. Neither of these men or anyone else told the plaintiff to go to or onto this gondola car of scrap metal for any purpose. Plaintiff knew the difference between discarded parts from railroad cars and scrap metal having no relation to railroad cars or railroad equipment. He knew that whenever he needed any material or supplies in connection with his blacksmith work it was his duty to request them from Mr. Wiley, the storekeeper. He knew that defendant maintained a gondola car for discarded scrap metal at the scrap dock on track 4, and to which he could go in case Mr. Wiley had no new material that would supply plaintiff's needs. At the time plaintiff got on top of the gondola carload of scrap metal all pending work in the blacksmith shop had been completed. He had no need to make a request upon the storekeeper for additional material. If such materials were needed by him it was his duty to request them from the storekeeper. The storekeeper unloaded a number of carloads of steel and other materials each month in connection with supplying the storehouse, but this work was done by the storekeeper's assistants. Plaintiff obviously knew that the gondola carload of scrap metal on track 15 was not the gondola carload maintained by the defendant for discarded scrap materials from freight cars at the scrap dock on track 4. He likewise knew that it was not a carload of inbound steel for replenishing the supplies of the storekeeper. Plaintiff could see the type of commercial scrap metal contained in the gondola car because of the scrap items hanging over the sides of the car and visible to anyone walking along the track.

 Plaintiff states that he got up on the gondola carload of scrap metal for the purpose of obtaining a piece of sheet steel for use in connection with the making of a dolly or cart. He had made such a dolly or cart about 11 months previously, at which time he had obtained some materials from defendant's carload of scrap metal that was maintained at its scrap dock on track 4. Plaintiff had no orders or directions to make another dolly or cart. He knew that if he did not have adequate materials at the blacksmith shop, it was his duty to request them of the storekeeper. He knew that whenever it was necessary to substitute discarded parts from defendant's scrap car maintained at the scrap dock, he was to receive directions from Mr. Hosticka or Mr. Oestmann. If plaintiff went upon the carload of commercial scrap metal to forage for something for his own personal use, he was guilty of unlawfully taking, possessing and carrying away property moving in interstate commerce which belonged either to the Chicago shipper or the Indiana consignee, in violation of the Federal statute. 18 U. S. C. A., Sec. 659. If he went upon this carload of scrap metal for the purpose of taking therefrom a piece of sheet metal 16″ x 12″ x ¼″ thick, he is equally guilty of violating the foregoing Federal statute. In the first instance he would appropriate the property unlawfully taken to his own personal use. In passing on defendant's motion for a judgment notwithstanding the verdict, we accept plaintiff's testimony that he went upon the carload of scrap metal for the purpose of taking a piece of sheet metal. In this situation he would aid and assist the defendant in unlawfully appropriating the property to defendant's use. Federal law makes one who aids and assists guilty as a principal. 18 U. S. C. A., Sec. 2; *United States v. Dolasco,* 184 F. (2d) 746. It makes no difference whether plaintiff went upon the

56

carload of commercial scrap metal for the purpose of stealing, possessing, taking or carrying away a piece of scrap metal for his own use or for defendant's use. It would make no difference whether defendant's foreman told him to do so or not. *Hunter v. Wheate,* 289 Fed. 604. A discussion of common-law larceny under Illinois law is irrelevant. The Federal statute prohibits the unlawful taking away of anything from an interstate shipment and makes provision for punishment where the value is less than $100 as well as where it is more than that sum. The scrap metal in the gondola car had a value necessarily depending on the individual pieces of scrap metal. The piece of scrap metal which plaintiff was taking away was a part of that shipment. We sustain defendant's position that the unlawful act of plaintiff in going on the gondola car of commercial scrap metal and taking therefrom a piece of metal, not the property of plaintiff or defendant, is a further reason why his action cannot be sustained. It is unnecessary to consider the other points discussed.

The judgment of the superior court of Cook county is reversed and the cause is remanded with directions to enter judgment notwithstanding the verdict for the defendant and against the plaintiff.

*Judgment reversed and cause remanded with directions.*

NIEMEYER, P. J. and FRIEND, J., concur.