STUART, Justice.
Limestone Creek Developers, LLC (“LCD”), sued Stuart Trapp and two companies in which Trapp had a controlling interest — Kyvest, Ltd., and Redesign, Inc. (these two companies are hereinafter referred to collectively as “the Trapp companies,” while all the defendants are referred to collectively as “the Trapp defendants”) — in the Madison Circuit Court after Trapp was unable or unwilling to close on a contract he had personally entered into agreeing to purchase all the lots in a new subdivision owned by LCD. The trial court entered a summary judgment in favor of the Trapp defendants, and LCD appeals. We affirm.
I.
Sometime in late 2007, Mark Yarbrough and Terry McDonald were contacted by Joe William Hulsey to gauge their interest in purchasing some property that Hulsey’s mother, Margaret B. Hulsey, owned in Toney. Joe Hulsey was aware that Yar-brough and McDonald had previous experience related to developing subdivisions, and he believed his mother’s property might be suited for such a project. Yar-brough and McDonald had never before personally purchased property and overseen its subsequent development into a subdivision; however, over a period of approximately 20 years they had done extensive site work for Trapp in connection with subdivisions his companies had developed, and they accordingly contacted him to discuss this opportunity. Trapp was in the midst of developing another subdivision, The Landings, less than five miles from Hulsey’s property, and, after visiting Mrs. Hulsey’s property, he expressed an interest in working with Yarbrough and McDonald to construct houses on the property if they subsequently purchased it. Yarbrough, McDonald, and Trapp thereafter had discussions with a bank official who orally agreed to lend money to fund both Yarbrough and McDonald’s initial purchase of Hulsey’s property and Trapp’s subsequent purchase of lots from them once the initial development of the proposed subdivision was complete.
Mrs. Hulsey thereafter visited The Landings to verify that she was comfortable with the general types of houses Trapp expected to build on the property, and she, Yarbrough and McDonald, and Trapp collectively agreed to certain restrictions and covenants that would govern the property. At some point, Yarbrough and McDonald created the entity known as LCD. On January 9, 2008, Yarbrough and McDonald formally signed a contract with Mrs. Hul-sey on behalf of LCD agreeing to purchase approximately 28 acres for $560,000. The contract was contingent on an engineer examining the property and conducting soil tests to confirm that the property was suitable for residential development, and Yarbrough and McDonald thereafter hired Nash Engineering, LLC, to complete those tests. Nash Engineering also drafted an initial layout for the subdivision, dividing the property into 51 lots based on Trapp’s request that each lot be approximately 100 feet wide. LCD thereafter closed on the property. LCD engaged in further negotiations with Trapp regarding the property, and Trapp eventually agreed to purchase the 51 lots from LCD for $30,000 each. The $30,000 price was a slight increase from the initial price discussed between the parties of approximately $29,000 because Trapp also wanted LCD to construct a decorative sign for the entrance to the subdivision comparable to the sign outside The Landings. Trapp also created the name for the new subdivision — Heritage Landings.
On March 7, 2008, Trapp signed a contract agreeing to purchase the 51 lots in *191 Heritage Landings from LCD for $30,000 each. Pursuant to the terms of the contract, Trapp agreed to purchase 10 lots once initial development of the subdivision was completed and then to purchase an additional 7 lots within the next 6 months. For all lots other than the first 10, Trapp was obligated to pay the corresponding interest on LCD’s bank loan along with the $30,000 lot price.
Following the execution of the contract, LCD commenced site work on the property, such as clearing the land and laying out streets. When it was discovered that 12 of the lots would need engineered septic systems, Trapp paid an engineer to complete the necessary work. On or about June 15, 2009, the initial development of Heritage Landings was completed, and LCD thereafter sought to have Trapp finalize his purchase of lots pursuant to the terms of the contract; however, Trapp would not do so, asserting that he no longer had the ability to finalize the purchase because of prevailing economic conditions that had negatively affected his home-building business.
On June 15, 2010, LCD sued Trapp, asserting fraud and breach-of-contract claims and seeking specific performance of the contract as well as damages, including attorney fees. LCD also sought a judgment from the trial court estopping Trapp from denying the validity of the contract. Trapp filed an answer on August 27, 2010, generally denying the allegations of LCD’s complaint. On August 16, 2011, LCD filed an amended complaint, adding the Trapp companies as defendants and asserting an alter ego theory and seeking “to pierce the veil” of the Trapp companies. LCD subsequently filed a motion for a summary judgment. The Trapp defendants filed a response and thereafter filed their own summary-judgment motion, arguing that Trapp’s contract with LCD was void because it purported to sell lots in a new subdivision before the county issued the permit to develop the subdivision, in violation of § ll-24-2(a), Ala.Code 1975, part of the county subdivision-control statutes, § 11-24-1 et seq., Ala.Code 1975, and in violation of various provisions in the Madison County Subdivision Regulations (“MCSR”).
On December 27, 2011, the trial court entered an order holding that the contract between LCD and Trapp violated § 11— 24-2(a) and was therefore void. Accordingly, the trial court entered a summary judgment in favor of the Trapp defendants on LCD’s breach-of-contract claim, as well as on LCD’s other claims, which, the trial court held, were all dependent on the contract, which was void. LCD’s subsequent motion to alter, amend, or vacate the judgment was denied, and, on March 29, 2012, LCD filed its notice of appeal to this Court.
II.
LCD argues that the trial court erred in entering a summary judgment in favor of the Trapp defendants. We review this argument pursuant to the following standard:
“This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wil *192 son v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12.”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).
III.
The gravamen of LCD’s argument on appeal is that its contract with Trapp did not violate § ll-24-2(a) or the MCSR and that the trial court accordingly erred by declaring that contract void and entering a summary judgment in favor of the Trapp defendants. Section ll-24-2(a) states, in relevant part:
“It shall be the duty of the owner and developer of each subdivision to have all construction completed in conformity with this chapter and, prior to beginning any construction or development, to submit the proposed plat to the county commission for approval and obtain a permit to develop as required in this section. The permit to develop shall be obtained before the actual sale, offering for sale, transfer, or lease of any lots from the subdivision or addition to the public, it must include a plan to deliver utilities including water, and shall only be issued upon approval of the proposed plat by the county commission.”
(Emphasis added.) LCD argues that its contract with Trapp did not violate § 11— 24-2(a) because, LCD argues, Trapp is not “the public” as that term is used in the statute. The term “the public” is not defined in § ll-24-2(a), and LCD argues that the term is not intended to encompass a business partner with whom the owner and/or developer of a subdivision is engaged in a joint venture; rather, LCD argues, “the public” generally refers to the ultimate purchaser of a lot once initial development of the subdivision is complete. The Trapp defendants, however, urge us to apply a broader definition of the term “the public” to include, essentially, anyone. Ultimately, however, it is unnecessary for us to define the term “the public” because, regardless of the definition we ascribe to the term, the contract between LCD and Trapp would nonetheless be void because it violates a prohibition in the MCSR.
The county subdivision-control statutes contemplate the adoption of additional regulations by the different counties governing the manner in which subdivisions are approved and developed in their jurisdiction. See, e.g., § ll-24-l(c), Ala.Code 1975 (“The county commission or like governing body of each county in the state may establish a board of developers to make suggestions to the commission regarding the development and division of subdivisions. The board may advise the commission on the contents of the regulations, revisions that need to be made to the regulations, and assist in resolving disputes between the commission and developers.”); § ll-24-2(b), Ala.Code 1975 (“No proposed plat shall be approved or disapproved by the county commission without first being reviewed by the county engineer or his or her designee. Following the review, the county engineer or his or her designee shall certify to the commission whether the proposed plat meets the county’s regulations. If the proposed plat meets the regulations, it shall be approved by the commission.”); and § 11-24-3(c), AIa.Code 1975 (“The county commission may employ inspectors and may request the county license inspector to see that its rules and regulations are not violated. ...”).
*193 Madison County has in fact enacted such regulations and a complete copy of the MCSR was submitted into the record by LCD along with its summary-judgment motion. Like § ll-24-2(a), § 4.3 of the MCSR provides that a permit to develop a subdivision may be obtained after a proposed plat is submitted to and approved by the county; § 4.3 further details the procedure for seeking approval of that proposed plat. However, unlike § ll-24-2(a), the MCSR prohibit the offering, sale, transfer, or lease of lots to the public even after the proposed subdivision plat is approved; such activity is prohibited until a final plat is submitted and approved once the owner or developer decides to proceed with the proposed subdivision. See § 4.1 of the MCSR (providing that no lot shall “be offered for sale, sold, transferred or leased to the public until the final plat has been submitted to and approved by the commission and the final plat has been recorded in the office of the probate judge”); and § 4.4 of the MCSR (describing the procedure for submitting and getting approval of the final plat).
Aside from this distinction, however, the MCSR contain another prohibition that is applicable in this case. Section 1.2.3 of the MCSR provides:
“Prior to the actual sale, offering for sale, transfer or lease of any lots as defined herein for the purpose of creating, establishing or modifying a subdivision as defined herein, any owner or developer of a subdivision ... which lies within the subdivision jurisdiction of the county shall submit the proposed plat of the proposed subdivision ... to the commission and obtain for [sic] approval of the proposed plat in accordance with the procedures prescribed by [§ 11-24-1 et seq., Ala.Code 1975,] as amended, and set out in these regulations.”
Thus, this regulation requires an owner or developer of a subdivision to submit and gain approval of a proposed subdivision plat before the sale or offering for sale of any lots “for the purpose of creating, establishing or modifying a subdivision.” Notably, there is no language barring only those sales or offerings made to “the public.”
It has been LCD’s position throughout this litigation that Trapp is not part of “the public” because he was essentially a partner in a joint venture created to develop Heritage Landings. Regardless of whether we agree that he is a member of “the public,” LCD cannot, in light of its position, maintain that its attempt to sell him lots was done for any purpose other than “creating, establishing or modifying a subdivision,” and whether he was a member of “the public” is immaterial to that inquiry. Accordingly, because the contract LCD entered into required LCD to sell lots to Trapp before the proposed plat for Heritage Landings was approved, that contract was in violation of § 1.2.3 of the MCSR.
The summary judgment in favor of the Trapp defendants was therefore proper because the judicial system may not be used to enforce illegal contracts. See, e.g., Ex parte W.D.J., 785 So.2d 390, 393 (Ala.2000) (“Moreover, this Court has held that ‘[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party.’ Hinkle v. Railway Express Agency, 242 Ala. 374, 378, 6 So.2d 417, 421 (1942). In Oden v. Pepsi Cola Bottling Co., 621 So.2d 953 (Ala.1993), this Court stated that the purpose of the Hinkle rule is to ensure that ‘ “those who transgress the moral or criminal code shall not receive aid from the judicial branch of government.” ’ 621 So.2d at 955.... ” (emphasis omitted)). See also Kilgore Dev., Inc. v. Woodland *194 Place, LLC, 47 So.3d 267, 271 (Ala.Civ.App.2009) (holding that subdivision-control statutes were implemented to protect the public, not to raise revenue, and that contracts violating those statutes are accordingly void).
Indeed, the policy behind this principle has been deemed to be of such importance that contracts found to violate the law will not be enforced even if, as has been alleged in this case, the defaulting party failed to properly plead the affirmative defense of illegality. Brown v. Mountain Lakes Resort, Inc., 521 So.2d 24, 26 (Ala.1988) (“ ‘ “It is the rule ... in Alabama and a few other jurisdictions to not enforce a contract in violation of the law and to deny the plaintiff the right to recover upon a transaction contrary to public policy, even if the invalidity of the contract or transaction be not specially pleaded and is developed by the defendant’s evidence.” ’ ” (quoting National Life & Accident Ins. Co. v. Middlebrooks, 27 Ala.App. 247, 249, 170 So. 84, 86 (1936), quoting in turn Shearin v. Pizitz, 208 Ala. 244, 246, 94 So. 92, 93 (1922))).
IV.
LCD sued the Trapp defendants after Trapp failed to close on the purchase of 51 lots in a new subdivision LCD was developing, as required by the contract entered into by LCD and Trapp. The trial court entered a summary judgment in favor of the Trapp defendants after holding that LCD’s contract with Trapp was void because it violated § ll-24-2(a). While expressing no opinion with regard to whether that contract violated § ll-24-2(a), we nevertheless hold that the contract was void because it violated § 1.2.3 of the MCSR. Accordingly, the trial court correctly entered a summary judgment in favor of the Trapp defendants on LCD’s breach-of-contract claim, as well as LCD’s other claims, which were dependent on that contract. The judgment of the trial court is accordingly affirmed.
AFFIRMED.
MALONE, C.J., and PARKER, SHAW, and WISE, JJ., concur.