MURDOCK, Justice.
The Court today decides three appeals involving similar issues of Indian tribal sovereign immunity and subject-matter jurisdiction arising out of actions filed by various plaintiffs against the Poarch Band of Creek Indians ("the Tribe"), and business entities wholly owned by the Tribe, and, in two of these cases, including this one, individual defendants. In addition to the present case, the Court today addresses the appeals before us in Harrison v. PCI Gaming Authority, 251 So.3d 24 (2017), *551 and Wilkes v. PCI Gaming Authority, [Ms. 1151312, September 29, 2017] --- So.3d ---- (2017). In each case, the circuit court granted a motion to dismiss the claims against the Tribe and its related business entities on one of those two grounds.
In the present case, Jerry Rape appeals from the Montgomery Circuit Court's dismissal of his action alleging breach of contract and various tort claims against the Tribe, PCI Gaming Authority, Creek Indian Enterprises, LLC, and Creek Casino Montgomery ("Wind Creek Casino" or "Wind Creek") (hereinafter referred to collectively as "the tribal defendants") and casino employees James Ingram and Lorenzo Teague and fictitiously named defendants. Because the plaintiff has no viable path to relief, we affirm.
I. Facts and Procedural History
On November 19, 2010, Rape and his wife visited Wind Creek Casino. At approximately 8:00 p.m., Rape inserted five dollars into a machine the complaint describes as an "electronic bingo gaming machine." The complaint alleges that "during a ... spin bet," the machine indicated a winning jackpot in the approximate amount of $459,000. Immediately thereafter, the machine indicated a payout multiplier of approximately $918,000, followed by an indication of a second payout multiplier of approximately $1,377,015.30. Several noises, lights, and sirens were activated when the machine displayed the payout amount. The screen then displayed a prompt to "call an attendant to verify winnings."
Rape alleged that at that point he was approached and congratulated by casino employees and patrons and that one casino employee said to him: "[D]on't let them cheat you out of it."[1] Rape alleged that the machine printed out a ticket containing the winning amount of $1,377,015.30 but that representatives of Wind Creek Casino took possession of the ticket and refused to return it to him. Rape was then taken by tribal officials or casino employees into "a back room," where they discussed how Rape's winnings would be paid, mentioning the possibility of a structured payout over a period of 20 to 30 years. Those officials then instructed Rape that he had to wait outside the room while they "called PCI" to confirm his winnings.
Rape alleged that he was made to wait into the early morning hours with no information provided to him, even though he saw several individuals entering and leaving the room, presumably to discuss the situation. Rape also stated that casino employees shut down and barricaded the machine in question so that it could not be patronized by other customers of Wind Creek Casino.
At 6:00 a.m. on November 20, 2010, Rape went home for a time before returning to Wind Creek Casino at approximately 11:00 a.m. In his complaint, Rape stated that, at approximately 9:00 p.m. on November 20, he
"was taken into a small room in the rear of [Wind Creek Casino] by casino and/or tribal officials, where he was told, in a threatening and intimidating manner, that the machine in question 'malfunctioned,' and that [Rape] did not win the jackpot of $1,377,015.30. [Rape] was given a copy of an 'incident report,' and left [Wind Creek Casino] empty-handed approximately 24 hours after winning the jackpot."
*552 On November 16, 2011, Rape sued the defendants in the Montgomery Circuit Court. He alleged claims of breach of contract; unjust enrichment; misrepresentation; suppression; civil conspiracy; negligence and/or wantonness; negligent hiring, training, and/or supervision; respondeat superior; and spoliation of evidence. For each claim, Rape requested damages in the amount of the jackpot he had allegedly won at Wind Creek Casino on November 19, 2010.
On January 20, 2012, the defendants filed a motion to dismiss Rape's complaint. All the defendants argued that the claims against them were barred by the doctrine of sovereign immunity and that the Tribe's court had exclusive adjudicative, or subject-matter, jurisdiction of any claim. On April 12, 2012, the circuit court held a hearing on the motion. On May 2, 2012, the circuit court entered a two-word order: "Granted. Dismissed." Rape filed a timely appeal.
II. Standard of Review
"In Newman v. Savas, 878 So.2d 1147 (Ala. 2003), this Court set forth the standard of review of a ruling on a motion to dismiss for lack of subject-matter jurisdiction:
" 'A ruling on a motion to dismiss is reviewed without a presumption of correctness. Nance v. Matthews, 622 So.2d 297, 299 (Ala. 1993). This Court must accept the allegations of the complaint as true. Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C., 828 So.2d 285, 288 (Ala. 2002). Furthermore, in reviewing a ruling on a motion to dismiss we will not consider whether the pleader will ultimately prevail but whether the pleader may possibly prevail. Nance, 622 So.2d at 299.'
" 878 So.2d at 1148-49."
Hall v. Environmental Litig. Grp., P.C., 157 So.3d 876, 879 (Ala. 2014).
III. Discussion
A. Introduction
This case presents two intertwined issues: (i) the adjudicative jurisdiction, or what usually is referred to as simply the "subject-matter jurisdiction," of the tribal and state courts over the underlying dispute and (ii) the alleged sovereign immunity of the tribal defendants. Both issues are grounded in the same fundamental principles regarding the nature of sovereignty and in corollary notions as to the reach of a sovereign's adjudicative authority and the extent of its immunity, as discussed in Part B, infra.
Rape argues that the Tribe was not formally "recognized" at the time of Congress's enactment of the "Indian Reorganization Act of 1934," 25 U.S.C. § 461 et seq. ("the IRA"),[2] and that, therefore, under the United States Supreme Court's holding in Carcieri v. Salazar, 555 U.S. 379, 381, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009), the Tribe cannot demonstrate a right to self-governance and sovereign immunity. Similarly, in an amicus brief in this appeal, the State of Alabama argues that the Tribe has not shown that it was both "recognized" and "under federal jurisdiction" in 1934 and that, therefore, it has no "tribal lands" validly removed from state political and adjudicative jurisdiction under the terms of the IRA.[3] (The same *553 arguments are made by the plaintiff in Harrison as to both the question of subject-matter jurisdiction and sovereign immunity and by the plaintiff in Wilkes insofar as the arguments in that case relate to immunity.)
The tribal defendants focus on the holding in Carcieri as one they contend is limited to the question whether the United States government could properly take land into trust. They contend that the answer to this question has no bearing on the issue of tribal sovereign immunity. That said, the tribal defendants in this case (as in Harrison ) argue vigorously that the land on which the claims arose was land that was properly taken into trust under the terms of the IRA and thereby properly removed from the political jurisdiction of the State of Alabama. According to the tribal defendants, this fact alone means that the Tribe's court has exclusive adjudicative, or subject-matter, jurisdiction over the dispute.
B. Attributes of Sovereignty and Sovereign Authority
As to the issue of sovereignty and of jurisdiction over Indian tribes and tribal lands, the Supreme Court has stated:
"Generalizations on this subject have become particularly treacherous. The conceptual clarity of Mr. Chief Justice Marshall's view in Worcester v. Georgia, 6 Pet. 515, 556-561 (1832), has given way to more individualized treatment of particular treaties and specific federal statutes, including statehood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government.... The upshot has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law."
Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973) (emphasis added). Given the import of our decisions in the three appeals we decide today, and the case-by-case approach described by the United States Supreme Court, we think it important to undergird our review and application of Supreme Court precedents with a clear understanding of the fundamental nature and attributes of sovereignty and sovereign immunity.
Most fundamentally, of course, sovereignty is the power to govern-the power of a government to regulate the affairs of men. As to a matter over which a government has no regulatory authority, it is not sovereign. Black's Law Dictionary 1631 (10th ed. 2014) defines "state sovereignty" as "[t]he right ... to self-government; the supreme authority exercised by each state." See, e.g., United States v. Wheeler, 435 U.S. 313, 320, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) ("[I]t is a State's own sovereignty which is the origin of its [governmental] power."); see also United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 316-17, 57 S.Ct. 216, 81 L.Ed. 255 (1936) ("A political society cannot endure without a supreme will somewhere.").
Second, the power of the sovereign is the power both to make law (sometimes itself referred to as "regulatory authority") and to adjudicate disputes arising under that law, those two powers necessarily being codependent and coextensive. See, e.g., Nevada v. Hicks, 533 U.S. 353, 357-58, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) ("A tribal court's adjudicative authority is, at *554 most, only as broad as the tribe's regulatory authority."); Strate v. A-1 Contractors, 520 U.S. 438, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) ("As to nonmembers ... a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction ....").
Third, sovereignty corresponds with, and is a function of, authority over some portion of the earth's surface-some "territory." It is not freestanding. "[F]ull and absolute territorial jurisdiction ... [is] the attribute of every sovereign." The Schooner Exch. v. McFaddon, 11 U.S. (7 Cranch) 116, 137 (1812). As the Restatement (Third) of Foreign Relations Law § 201 (1987) explains, "[u]nder international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." (Emphasis added.)
"On [a] transfer of territory [between two sovereigns], ... the relations of the inhabitants ... with their former sovereign are dissolved, and new relations are created between them, and the government which has acquired their territory."
American Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 542-43, 7 L.Ed. 242 (1828).
Fourth, the very reason for the existence of sovereign immunity is to facilitate the sovereignty of the sovereign. Thus, it is the essential nature of sovereign immunity that it is coextensive with the sovereignty it serves; by nature it operates only within the physical boundaries and the regulatory and adjudicatory boundaries of that sovereignty. "It is 'inherent in the nature of sovereignty not to be amenable' to suit without consent." The Federalist No. 81, p. 511 (Alexander Hamilton) (B. Wright ed. 1961). See Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 169 n.18, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (discussing "sovereign immunity" as an "attribute[ ] of sovereignty"). Explaining that it is "[s]overeignty" itself that "implies immunity from lawsuits," the Court in Michigan v. Bay Mills Indian Community, 572 U.S. 782, ----, 134 S.Ct. 2024, 2030, 188 L.Ed.2d 1071 (2014), described immunity as a "core aspect of sovereignty" and, moreover, as a " 'necessary corollary to ... sovereignty and self-governance.' '' (Quoting Three Affiliated Tribes of Fort Berthold Reservation v. World Eng'g, P.C., 476 U.S. 877, 890, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986) (emphasis added).)
Fifth, as corollary to the principle that sovereign immunity is coextensive with the sovereignty it serves, so too sovereign immunity naturally exists only in the courts that themselves derive from and serve that same sovereignty, and that thus operate within the same physical and regulatory boundaries that define that sovereignty. That is, historically and by its fundamental nature, sovereign immunity is and has been limited to the courts of the sovereign itself-courts formed by the government and located within the territory over which the government served by the doctrine is sovereign. See Black's Law Dictionary 868 (10th ed. 2014) (defining "sovereign immunity" as "1. A government's immunity from being sued in its own courts without its consent").
In Alden v. Maine, 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999), the United States Supreme Court explained:
"In [ Nevada v.] Hall [, 440 U.S. 410 (1979) ], we considered whether California could subject Nevada to suit in California's courts and determined the Constitution did not bar it from doing so. We noted that *555 '[t]he doctrine of sovereign immunity is an amalgam of two quite different concepts, one applicable to suits in the sovereign's own courts and the other to suits in the courts of another sovereign.' 440 U.S. at 414. We acknowledged that '[t]he immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries. Only the sovereign's own consent could qualify the absolute character of that immunity,' ibid., that 'the notion that immunity from suit is an attribute of sovereignty is reflected in our cases,' id., at 415, and that '[t]his explanation adequately supports the conclusion that no sovereign may be sued in its own courts without its consent,' id., at 416. We sharply distinguished, however, a sovereign's immunity from suit in the courts of another sovereign:
" '[B]ut [this explanation] affords no support for a claim of immunity in another sovereign's courts. Such a claim necessarily implicates the power and authority of a second sovereign; its source must be found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity.' Ibid."
527 U.S. at 738.[4]
With these foundational principles in mind, we turn to the case before us.
C. Analysis
The trial court in the present case dismissed the action without providing a rationale for its decision. It simply entered a copy of the defendants' motion to dismiss on which it wrote: "Granted. Dismissed." We can affirm the trial court's order of dismissal if it can be upheld on either of the two jurisdictional grounds presented in the defendants' motions, namely (i) the alleged lack of adjudicative, or subject-matter, jurisdiction of the court itself or (ii) the asserted sovereign immunity of the tribal defendants. See generally Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala. 2003). The State, in its amicus brief, suggests that it would be more appropriate to begin with the more fundamental, and threshold, issue of adjudicative, or subject-matter, jurisdiction.
In April of this year, the United States Supreme Court issued its opinion in Lewis v. Clarke, 581 U.S. ----, 137 S.Ct. 1285, 197 L.Ed.2d 631 (2017). Under Lewis, regardless of what we might decide as to the issue of sovereign immunity in relation to the tribal defendants, the individual defendants, being sued in their individual capacity, would not be entitled to tribal immunity simply because they were employed by the tribe or acting within the scope of that employment. See Lewis, 581 U.S. ----, 137 S.Ct. at 1289. On that basis, we would have to reach the issue of the court's subject-matter jurisdiction in any event, i.e., at least for purposes of resolving the claims against the individual defendants. Consequently, and consistent with the State's suggestion that subject-matter jurisdiction is the more threshold question in any event, we turn first to the issue of subject-matter jurisdiction.
*556 The issue presented is whether jurisdiction over this dispute resides in the tribal courts to the exclusion of the state courts. In 2008, the United States Supreme Court reiterated that a tribe's sovereign authority is unique, with limitations as to both (i) its territorial reach and (ii) the subject matter and persons to which it extends:
"For nearly two centuries now, we have recognized Indian tribes as 'distinct, independent political communities,' Worcester v. Georgia, 6 Pet. 515, 559 (1832), qualified to exercise many of the powers and prerogatives of self-government, see United States v. Wheeler, 435 U.S. 313, 322-323 (1978). We have frequently noted, however, that the 'sovereignty that the Indian tribes retain is of a unique and limited character.' Id., at 323. It centers [i] on the land held by the tribe and [ii] on tribal members within the reservation. See United States v. Mazurie, 419 U.S. 544, 557 (1975) (tribes retain authority to govern 'both their members and their territory,' subject ultimately to Congress ) ...."
Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008) (emphasis added).
In Hicks, supra, the Supreme Court, in an opinion authored by Justice Scalia, held that, even though the claims at issue there occurred within the boundaries of an Indian reservation: (1) a tribal court did not have jurisdiction to adjudicate trespass and other tort claims arising from the actions of state officials while executing process on reservation lands in relation to a crime that occurred off reservation and (2) a tribal court did not have authority to adjudicate § 1983 claims arising from those same actions occurring on the reservation. The Supreme Court explained that "[t]he principle of Indian law central to this aspect of the case is our holding in Strate v. A-1 Contractors, 520 U.S. 438, 453 (1997) : 'As to nonmembers ... a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction.' " 533 U.S. at 357-58 (emphasis added). As the Supreme Court more fully explained elsewhere in Hicks:
"Respondents' contention that tribal courts are courts of 'general jurisdiction' is also quite wrong. A state court's jurisdiction is general, in that it 'lays hold of all subjects of litigation between parties within its jurisdiction, though the causes of dispute are relative to the laws of the most distant part of the globe.' [The Federalist No. 82 (Alexander Hamilton) ] at 493 [ (C. Rossiter ed. 1961) ]. Tribal courts, it should be clear, cannot be courts of general jurisdiction in this sense, for a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as broad as its legislative jurisdiction."[5]
*557 533 U.S. at 367 (emphasis added).
As to the subject matter and persons to which tribal regulatory authority extends, the United States Supreme Court has consistently recognized that, absent congressional involvement, Indian tribes retain regulatory authority over "internal and social relations" on Indian land, sometimes expressed as tribes having "attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975) (emphasis added).
"Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government. Worcester v. Georgia, 6 Pet. 515, 559 (1832) ; see United States v. Mazurie, 419 U.S. 544, 557 (1975) ; F. Cohen, Handbook of Federal Indian Law 122-123 (1945). Although no longer 'possessed of the full attributes of sovereignty,' they remain a 'separate people, with the power of regulating their internal and social relations.' United States v. Kagama, 118 U.S. 375, 381-382 (1886). See United States v. Wheeler, 435 U.S. 313 (1978). They have power to make their own substantive law in internal matters, see Roff v. Burney, 168 U.S. 218 (1897) (membership); Jones v. Meehan, 175 U.S. 1, 29 (1899) (inheritance rules); United States v. Quiver, 241 U.S. 602 (1916) (domestic relations), and to enforce that law in their own forums, see, e. g., Williams v. Lee, 358 U.S. 217 (1959)."
Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55-56 (1978) (emphasis added) (holding that a tribal court had exclusive jurisdiction over a dispute arising from an Indian tribe's denial of tribal membership to the children of certain female tribal members).
Accordingly, as to matters arising on Indian lands,
"[t]he sovereignty retained by tribes includes 'the power of regulating their internal and social relations,' United States v. Kagama, 118 U.S. 375, 381-382 (1886), cited in United States v. Wheeler, 435 U.S. 313, 322 (1978). A tribe's power to prescribe the conduct of tribal *558 members has never been doubted, and our cases establish that 'absent governing Acts of Congress,' a State may not act in a manner that 'infringed on the right of reservation Indians to make their own laws and be ruled by them.' McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 171-172 (1973), quoting Williams v. Lee, 358 U.S. 217, 219-220 (1959)."
New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 332-33, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983).
Thus, a tribe has the right to regulate its own "internal and social relations" on a reservation-i.e., the "right of reservation Indians to make their own laws and be ruled by them"-except as a "governing Act of Congress" may otherwise prescribe. As Justice Scalia, writing for the Court in Hicks, further explained:
"Indian tribes' regulatory authority over nonmembers is governed by the principles set forth in Montana v. United States, 450 U.S. 544 (1981), which we have called the 'pathmarking case' on the subject, Strate [v. A-1 Contractors, 520 U.S. 438, 445 (1997) ]. In deciding whether the Crow Tribe could regulate hunting and fishing by nonmembers on land held in fee simple by nonmembers [within a reservation], Montana observed that, under our decision in Oliphant v. Suquamish Tribe, 435 U.S. 191 (1978), tribes lack criminal jurisdiction over nonmembers. Although, it continued, ' Oliphant only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.' 450 U.S. at 565 (footnote omitted). Where nonmembers are concerned, the 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.' Id., at 564 (emphasis added).
"....
"In Strate, we explained that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which Montana referred: tribes have authority '[to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members,' 520 U.S. at 459 (brackets in original), quoting Montana, supra, at 564. These examples show, we said, that Indians have ' "the right ... to make their own laws and be ruled by them," ' 520 U.S. at 459, quoting Williams v. Lee, 358 U.S. 217, 220 (1959). See also Fisher v. District Court of Sixteenth Judicial Dist. of Mont., 424 U.S. 382, 386 (1976) (per curiam) ('In litigation between Indians and non-Indians arising out of conduct on an Indian reservation, resolution of conflicts between the jurisdiction of state and tribal courts has depended, absent a governing Act of Congress, on whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them' (internal quotation marks and citation omitted)). Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them."
533 U.S. at 358-61 (footnote omitted; some emphasis added).
*559 In Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), to which the Hicks Court referred, the Court noted the State's authority to regulate conduct on a State highway right-of-way located on a reservation. Based largely on this fact, the Court held that adjudicative authority over an accident occurring on the highway was not part of the tribe's "self-governance'':
"The second exception to Montana [v. United States'] general rule [against tribal-court jurisdiction over nonmembers] concerns conduct that 'threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.' 450 U.S. [544], at 566 [ (1981) ]. Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if Montana 's second exception requires no more, the exception would severely shrink the rule....
"....
"... Key to its proper application ... is the [ Montana ] Court's preface: 'Indian tribes retain their inherent power [to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.... But [a tribe's inherent power does not reach] beyond what is necessary to protect tribal self-government or to control internal relations.' 450 U.S. at 564. Neither regulatory nor adjudicatory authority over the state highway accident at issue is needed to preserve 'the right of reservation Indians to make their own laws and be ruled by them.' Williams [v. Lee ], 358 U.S. [217], at 220 [ (1959) ]."
Strate, 520 U.S. at 457-59 (emphasis added).
"Our cases make clear that the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation. State sovereignty does not end at a reservation's border. Though tribes are often referred to as 'sovereign' entities, it was 'long ago' that 'the Court departed from Chief Justice Marshall's view that "the laws of [a State] can have no force" within reservation boundaries. Worcester v. Georgia, 6 Pet. 515, 561 (1832),' White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 141 (1980). 'Ordinarily,' it is now clear, 'an Indian reservation is considered part of the territory of the State.' U.S. Dept. of Interior, Federal Indian Law 510, and n.1 (1958), citing Utah & Northern R. Co. v. Fisher, 116 U.S. 28 (1885) ; see also Organized Village of Kake v. Egan, 369 U.S. 60, 72 (1962).
"That is not to say that States may exert the same degree of regulatory authority within a reservation as they do without. To the contrary, the principle that Indians have the right to make their own laws and be governed by them requires 'an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.' Washington v. Confederated Tribes of Colville Reservation, 447 U.S. 134, 156 (1980) ; see also id., at 181 (opinion of Rehnquist, J.). 'When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest.' Bracker, supra, at 144. When, however, state interests outside the reservation are implicated, States may regulate the *560 activities even of tribe members on tribal land, as exemplified by our decision in Confederated Tribes [in 1980]."
Hicks, 533 U.S. at 361-62 (footnote omitted; emphasis added).
Based on the foregoing, the proposition that the tribal court had exclusive adjudicative, or subject-matter, jurisdiction turns on two elements. The first is whether the dispute arose within territory, i.e., on land, that is properly within the political jurisdiction of the Tribe. The second is whether the dispute concerns a subject and persons over which the tribal court has regulatory authority, either because it concerns tribal or internal relations or because Congress has otherwise so stated.
As to whether the present claims arose on land under the political jurisdiction of the Tribe rather than the State, it appears that genuine questions are raised regarding the status of the Tribe in 1934 and, accordingly, whether the Tribe was eligible to have land taken out of the political jurisdiction of the State of Alabama under the taking-in-trust provisions of the IRA. See note 3, supra (discussing the IRA and Carcieri's construction of it). It is undisputed that the Tribe had not formed as a discrete political entity at that time and that there existed little in the way of organizational parameters until well after 1934. It likewise is undisputed that the Tribe did not obtain formal recognition by the federal government until 1984. In the Tribe's own submission to the Department of Interior in 1983 by which, for the first time, it sought that recognition, the Tribe states that it had "no formal political organization ... in the nineteenth century, nor in much of the 20th century." If this is the case, it is difficult to see how it can be said that a tribe existed that was "under federal jurisdiction" in 1934. Further, in 1937, shortly after IRA was enacted, the Bureau of Indian Affairs prepared a list of 258 tribes that were "recognized" at that time; the Tribe was not on that list. See Letter from Secretary of Interior John Collier to Chairman, Committee on Indian Affairs, E. Thomas, March 18, 1937: List of Indian Tribes Under the Indian Reorganization Act.[6] Thus, even if the Tribe, though not possessing a formal structure in 1934, could be said in some, perhaps inchoate, sense,[7] to have been "under federal jurisdiction" in 1934, it is difficult to conclude that the Tribe was formally "recognized" by the federal government at that time.
The United States Supreme Court has not decided whether the temporal limitation recognized in Carcieri applies only to the "under-federal-jurisdiction" requirement, or also to the recognition requirement.
*561 Although three Justices (Breyer, Souter, and Ginsburg) have suggested that it applies only to the under-federal-jurisdiction prong of the test, this position has been taken in special writings by those Justices; it has not yet been adopted by a majority of the Court.
We note again the specific language of the IRA at issue: "recognized Indian tribe now under federal jurisdiction." This phrase must be read as a whole, with both parts taking meaning from the other. Indeed, the simplest explanation for this structure (and one consistent with the aforesaid statutory purpose) would seem to be that Congress was describing a fixed universe of tribes possessed of the necessary attributes described in the IRA at the time of its adoption. See note 7, supra. That is, it reasonably may be put that the phrase simply means that singular and fixed group of tribes that, as "recognized ... tribe[s]," were "under federal jurisdiction" at the specified date.
Moreover, grammatically, in the phrase "recognized Indian tribe now under federal jurisdiction," the adjectival phrase "now under federal jurisdiction" does not modify the term "tribe." It modifies the term "recognized Indian tribe." One may ask therefore how it is that an Indian tribe could have been a "recognized ... tribe ... under federal jurisdiction" on the prescribed date, unless it first was a "recognized ... tribe" on that date.
The tribal defendants contend that the challenge by Rape to the removal of the land from the political jurisdiction of the State of Alabama must be brought within the confines of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and its six-year statute of limitations, both of which were held to be bars to the State's action in Alabama v. PCI Gaming Authority, 801 F.3d 1278, 1291-92 (11th Cir. 2015). But, of course, in contrast to the State of Alabama in that case, the plaintiff here was not given notice of the taking into trust when it occurred, had no reason to take notice of it, and certainly had no reason to challenge it at that time, considerations that were key to the decision of the United States Court of Appeals for the Eleventh Circuit (even as it pretermitted discussion of other potential obstacles to the State's action). See 801 F.3d at 1291-93. Compare, e.g. Big Lagoon Rancheria v. California, 741 F.3d 1032, 1042-43 (9th Cir. 2014), overruled on reh'g en banc, 789 F.3d 947 (9th Cir. 2015) (quoting Wind River Mining Corp. v. United States, 946 F.2d 710, 715 (9th Cir. 1991) ) (distinguishing between procedural APA challenges and substantive claims). Compare Wind River (allowing a challenge outside of an APA proceeding and beyond the six-year statute of limitations prescribed by the APA and beyond the APA's six-year statute of limitations to a federal agency's commitment of land to a watershed-protection program).
Ultimately, it is not necessary for this Court to resolve the foregoing issue. In Michigan v. Bay Mills Indian Community, 695 F.3d 406 (6th Cir. 2012), aff'd and remanded, 572 U.S. 782, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014), the United States Court of Appeals for the Sixth Circuit described a "Catch-22" that made it unnecessary to decide a similar issue:
"That said, we acknowledge the irony of this case: Bay Mills, the defendant here, alleges that the Vanderbilt casino is located on 'Indian lands'-in which case [ 25 U.S.C.] § 2710(d)(7)(A)(ii) would supply federal jurisdiction. Thus, the plaintiffs say, the district court should cut to the chase and determine whether the Vanderbilt casino is, in fact, located on Indian lands. But that leads to the second Article III defect in the plaintiffs' claims: there is no possibility *562 of redressing their injury by means of a § 2710(d)(7)(A)(ii) claim. See Lujan [v. Defendersof Wildlife ], 504 U.S. [555] at 561[ (1992) ]. As the case comes to us here, a determination whether the Vanderbilt casino is located on Indian lands would be purely advisory: if the Vanderbilt casino is not located on Indian lands, there is no jurisdiction for the plaintiffs' claims ...."
695 F.3d at 412-13.
In the present case, we find ourselves in a comparable "Catch-22." Were we to conclude that the lands on which the wrongs occurred were not properly taken into trust and therefore were not properly considered "Indian country," this would mean that those lands remain fully within the political jurisdiction of the State of Alabama. The activity out of which Rape's claim arose, however, was gambling. If it occurred on land within the regulatory and adjudicative jurisdiction of the State of Alabama, that activity was illegal. Specifically, that land is located in Elmore County and, therefore, is not located in one of the counties in Alabama where even the game commonly and traditionally known as bingo is permitted. See State v. $223,405.86, 203 So.3d 816, 849 (Ala. 2016) (appendix listing local amendments legalizing the game commonly and traditionally known as "bingo" in selected localities); Article IV, § 65, Ala. Const. 1901 (generally prohibiting games of chance in Alabama); Code of Alabama 1975, Title 13A, Ch. 12, Art. 2 (to like effect).
It is well established that this Court will not aid a plaintiff seeking to recover under an illegal contract but, instead, will simply leave the parties where it finds them. Thus, in Thompson v. Wiik, Reimer & Sweet, 391 So.2d 1016 (Ala. 1980), this Court affirmed the trial court's order dismissing the plaintiff's claims and explained:
"As a general principle, a party may not enforce a void or illegal contract either at law or in equity. 17 C.J.S. Contracts § 272, pp. 1188-95 (1963).
"The effect of the illegality of a contract is summarized in Corpus Juris Secundum:
" 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim. The rule is expressed in the maxims, Ex dolo malo non oritur actio, and In pari delicto potior est conditio defendentis. The law in short will not aid either party to an illegal agreement; it leaves the parties where it finds them.'
" 17 C.J.S. Contracts § 272, p. 1188 (1963)."
391 So.2d at 1020.
" ' "[C]ontracts specially prohibited by law, or the enforcement of which violated a law, or the making of which violated the law ... [are] void and nonenforceable ... (and) Whenever a party requires the aid of an illegal transaction to support his case, he cannot recover." ' " Lucky Jacks Entm't Ctr., LLC v. Jopat Bldg. Corp., 32 So.3d 565, 569 n.3 (Ala. 2009) (quoting Bankers & Shippers Ins. Co. of New York v. Blackwell, 255 Ala. 360, 366, 51 So.2d 498, 502 (1951), quoting in turn Ellis v. Batson, 177 Ala. 313, 318, 58 So. 193, 194 (1912) )). See, e.g., Macon Cty. Greyhound Park, Inc. v. Hoffman, 226 So.3d 152, 167 (Ala. 2016) (declining to provide requested relief because "[t]his Court has repeatedly held that electronic-bingo games, such as those at issue in these cases, constitute illegal gambling in *563 Alabama" and, "[a]ccordingly, the arbitration provision itself would constitute a void contract because it is, at least in part, based on illegal gambling consideration").
And as indicated, this principle applies whether the claim framed by a plaintiff sounds in contract or in tort; either way, a plaintiff cannot recover on a claim that depends upon or requires the aid of an illegal contract. Ingraham v. Foster, 31 Ala. 123, 127 (1857) (fraud claim). " 'Related claims based on causes of action other than contract, including negligence, also cannot be pursued if they arise out of the performance of the illegal contract.' " King v. Riedl, 58 So.3d 190, 195 (Ala. Civ. App. 2010) (quoting IPSCO Steel (Alabama), Inc. v. Kvaerner U.S., Inc., (No. Civ. A. 01-0730-CG-C, May 25, 2005) (S.D. Ala. 2005) (not reported in F. Supp. 2d)). See also White v. Miller, 718 So.2d 88, 90 (Ala. Civ. App. 1998) (disallowing claims for "fraud and deceit" grounded in an illegal contract).
"A person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party. 1 Corpus Juris Secundum, Actions, page 996, § 13; 1 Corpus Juris page 957, § 52. An analogy is presented with respect to an illegal contract, where the plaintiff fails if, in order to prove his case, he must resort to such contract. 13 Corpus Juris, page 503, section 445, 17 C.J.S., Contracts, § 276. These principles apply whether the cause of action is in contract or in tort. 1 Corpus Juris Secundum, Actions, page 999, § 13."
Hinkle v. Railway Express Agency, 242 Ala. 374, 378, 6 So.2d 417, 421 (1942). " 'Moreover, this Court has held that "[a] person cannot maintain a cause of action if, in order to establish it, he must rely in whole or in part on an illegal or immoral act or transaction to which he is a party." Limestone Creek Developers, LLC v. Trapp, 107 So.3d 189, 193 (Ala. 2012) (quoting Ex parte W.D.J., 785 So.2d 390, 393 (Ala. 2000), quoting in turn Hinkle, 242 Ala. at 378, 6 So.2d at 421 ). "[S]uch a rule derives principally ... [']from a desire to see that those who transgress the moral or criminal code shall not receive aid from the judicial branch of government.' " Oden v. Pepsi Cola Bottling Co. of Decatur, 621 So.2d 953, 955 (Ala. 1993) (quoting Bonnier v. Chicago, B.& Q. R.R., 351 Ill.App. 34, 51, 113 N.E.2d 615, 622 (1953) ).
This defect is so fundamental that we may raise the issue ex mero motu. See, e.g., Limestone Creek Developers, 107 So.3d at 194 (observing that "the policy behind this principle has been deemed to be of such importance that contracts found to violate the law will not be enforced even if ... the defaulting party failed to properly plead the affirmative defense of illegality. Brown v. Mountain Lakes Resort, Inc., 521 So.2d 24, 26 (Ala. 1988) (' " 'It is the rule ... in Alabama and a few other jurisdictions to not enforce a contract in violation of the law and to deny the plaintiff the right to recover upon a transaction contrary to public policy, even if the invalidity of the contract or transaction be not specially pleaded and is developed by the defendant's evidence.' " ' (quoting National Life & Accident Ins. Co. v. Middlebrooks, 27 Ala. App. 247, 249, 170 So. 84, 86 (1936), quoting in turn Shearin v. Pizitz, 208 Ala. 244, 246, 94 So. 92, 93 (1922) ))."); City of Ensley v. J.E. Hollingsworth & Co., 170 Ala. 396, 413, 54 So. 95, 100-01 (1909) (explaining that in cases involving contracts that are "void as violative of a statute or because offensive to public policy"-in contrast to actions based on contracts that are void for another reason-"no action can arise out of the transaction for any purpose").
*564 Thus, similar to the plaintiff in Bay Mills, Rape ultimately could receive no relief based on the fact that his claims arose on land not properly considered Indian country, because that very fact would create its own bar to relief from this Court. We turn therefore to the second element applicable to a determination of tribal-court jurisdiction, and in turn state-court jurisdiction, namely whether that dispute is a matter of internal or tribal relations or, alternatively, is a dispute specially consigned to the regulatory authority of a tribe by Congress.
Again, as the United States Supreme Court has explained:
"[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.' [ Montana v. United States,] 450 U.S. [544], at 565 [ (1981) ] (footnote omitted). Where nonmembers are concerned, the 'exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.' Id., at 564 (emphasis added).
"....
"In Strate [v. A-1 Contractors, 520 U.S. 438 (1997) ], we explained that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which Montana referred: tribes have authority '[to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members,' 520 U.S. at 459 (brackets in original), quoting Montana, supra, at 564. These examples show, we said, that Indians have ' "the right ... to make their own laws and be ruled by them," ' 520 U.S. at 459, quoting Williams v. Lee, 358 U.S. 217, 220 (1959)."
Hicks, 533 U.S. at 358-59, 360-61 (footnote omitted; some emphasis added).
There is no "express congressional delegation" to Indian tribes of the authority to regulate or adjudicate contract and tort disputes generally that involve a nonmember. Compare 18 U.S.C. § 1153 (commonly known as "the Major Crimes Act") (establishing federal jurisdiction over 13 enumerated felonies committed by "[a]ny Indian ... against the person or property of another Indian or other person ... within the Indian country" except where such offense is "not defined and punished by Federal law" in which case it "shall be defined and punished in accordance with the laws of the State in which such offense was committed"). At first blush, therefore, it might appear that we are left with the same examples the Hicks Court used to measure whether the activity out of which this dispute arises is a matter within the ambit of "tribal self-government and ... internal relations," i.e., a matter as to which tribes "have the right to make their own laws and be governed by them." And if that be the case, the dispute here does not appear to involve internal tribal affairs of the nature described by the Supreme Court in Hicks.
The present dispute does, however, arise out of an activity-gambling on (what we assume for present purposes is) Indian land-as to which there is a "congressional enactment." See Indian Gaming Regulatory Act ("IGRA"), Pub.L. 100-497, § 2, Oct. 17, 1988, 102 Stat. 2467, codified at 25 U.S.C. § 2701 et seq. Of course, in one sense, this legislation is not an "express congressional delegation" to the Tribe of regulatory authority. Instead, Congress itself has made the decision as to whether and what forms of gambling will be available *565 to a tribe. See id. As to those forms of gambling Congress has in fact authorized a tribe to elect, however, it can be assumed that it intended a tribe to exercise such secondary regulatory authority as is reasonably necessary to implement such election and, in that regard, to adjudicate any disputes arising out of that activity.
That said, Congress has not authorized all forms of gambling on Indian reservations. To the contrary, it specifically has prohibited some. That is, Congress specifically has denied to tribes the right to "regulate," or to "self-govern" as to, certain forms of gambling. And as to a form of gambling not otherwise specifically authorized or prohibited under IGRA, whether the tribe has authority to "regulate" the same depends, under 25 U.S.C. § 2701(5), on whether it is a form of gambling "not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." (Emphasis added.)
The description in the complaint of the activity out of which Rape's claims arise suggests a form of gambling as to which the applicable congressional enactments have not delegated express regulatory authority to the Tribe, but, instead, a form of gambling, the regulation of which may be "specifically prohibited" by those enactments. Sections 2703(7) and 2710(b) of IGRA delegate to tribes the authority to engage in or "regulate" certain forms of gambling as "Class II" gaming if the State permits that type of gaming elsewhere in the State. One of the forms of gambling allowed under this condition is the game "commonly known as bingo," 25 U.S.C. § 2703(7)(A)(i), a concept this Court has examined repeatedly and at great length.[8] Although the federal statute may accommodate certain electronic aids more freely than does Alabama law, see 25 U.S.C. § 2703(7)(A)(i), other fundamental attributes of "the game of chance commonly known as bingo" are not altered by the statute.[9] In any event, insofar as applicable here, IGRA expressly and specifically prohibits "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." 25 U.S.C. § 2703(7)(B)(ii).
Where a federal enactment does not specifically authorize a given form of gambling on Indian land, and even prohibits it, we see no basis for treating disputes between tribal members and nonmembers arising out of that activity any differently than any other dispute arising out of activity on tribal lands not the subject of an "express congressional delegation." Under that circumstance, the above-discussed criteria outlined by the Supreme Court for disputes arising on Indian lands between two nonmembers or between a tribal member and a nonmember would apply.[10]
*566 At this juncture, however, the record in this case is not adequate to permit a determination as to whether the activity out of which Rape's claims arose is a form of gambling as to which the applicable congressional enactments have delegated express regulatory authority to the Tribe, or one "specifically prohibited" by those enactments. We do not find it necessary to consider further either the question itself, or the possibility of a remand to address it, because, much like the question of the status of the tribal land, neither answer that might be achieved would allow us to provide Rape the relief he seeks.
On the one hand, if the dispute here arises from activity determined to be "permitted by Federal law" and thus to be the subject of a congressional delegation of "regulatory authority" to the Tribe, then disputes arising out of the same would, as noted, likewise be a legitimate adjudicative matter for the Tribe, and the circuit court's dismissal of Rape's claims would have been proper on that basis. But conversely, even if it were to be determined that the gaming at issue were illegal under the provisions of IGRA and therefore not the subject of an "express congressional delegation" of regulatory authority to the Tribe, it would be that very illegality that would also prevent our state courts from providing relief to Rape under the principles discussed previously.
Under the unique circumstances of this case, therefore, there is no analytical path to an award of relief for Rape. Accordingly, we must affirm the circuit court's judgment of dismissal.
IV. Conclusion
For the foregoing reasons, the judgment of dismissal in the present case is affirmed.
AFFIRMED.
Bolin, Parker, and Wise, JJ., concur.
Stuart, C.J., and Main and Bryan, JJ., concur in the result.
Shaw and Sellers, JJ., recuse themselves.

The complaint does not provide the name of the employee who allegedly made this statement to Rape.

The text of the IRA has been transferred to 25 U.S.C. § 5101 et seq., but to avoid confusion with the citations in many cases we refer to the original section numbers of applicable provisions.

25 U.S.C. §§ 465 and 478 (now §§ 5108 and 5129) of the IRA authorize the federal government to take lands into trust for "recognized Indian tribe[s] now under Federal jurisdiction," with "now" being held in Carcieri v. Salazar, 555 U.S. at 388, to mean 1934.

The attributes of sovereignty and sovereign immunity discussed in this section underlie Justice Stevens's special writings in Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), and Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998), and Justice Thomas's compelling analysis in Bay Mills. See Bay Mills, 572 U.S. at ----, 134 S.Ct. at 2045 (Thomas, J., dissenting).

The Hicks Court further explained:
"[Tribal courts] differ from traditional American courts in a number of significant respects. To start with the most obvious one, it has been understood for more than a century that the Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes. See Talton v. Mayes, 163 U.S. 376, 382-385 (1896) ; F. Cohen, Handbook of Federal Indian Law 664-665 (1982 ed.) (hereinafter Cohen) ('Indian tribes are not states of the union within the meaning of the Constitution, and the constitutional limitations on states do not apply to tribes'). Although the Indian Civil Rights Act of 1968 (ICRA) makes a handful of analogous safeguards enforceable in tribal courts, 25 U.S.C. § 1302, 'the guarantees are not identical,' Oliphant [v. Suquamish Indian Tribe ], 435 U.S. [191], 194 [ (1978) ], and there is a 'definite trend by tribal courts' toward the view that they 'ha[ve] leeway in interpreting' the ICRA's due process and equal protection clauses and 'need not follow the U.S. Supreme Court precedents "jot-for-jot," ' Newton, Tribal Court Praxis: One Year in the Life of Twenty Indian Tribal Courts, 22 Am. Indian L. Rev. 285, 344, n. 238 (1998). In any event, a presumption against tribal-court civil jurisdiction squares with one of the principal policy considerations underlying Oliphant, namely, an overriding concern that citizens who are not tribal members be 'protected ... from unwarranted intrusions on their personal liberty,' 435 U.S. at 210 (emphasis added).
"Tribal courts also differ from other American courts (and often from one another) in their structure, in the substantive law they apply, and in the independence of their judges. Although some modern tribal courts 'mirror American courts' and 'are guided by written codes, rules, procedures, and guidelines,' tribal law is still frequently unwritten, being based instead 'on the values, mores, and norms of a tribe and expressed in its customs, traditions, and practices,' and is often 'handed down orally or by example from one generation to another.' Melton, Indigenous Justice Systems and Tribal Society, 79 Judicature 126, 130-131 (1995). The resulting law applicable in tribal courts is a complex 'mix of tribal codes and federal, state, and traditional law,' National American Indian Court Judges Assn., Indian Courts and the Future 43 (1978), which would be unusually difficult for an outsider to sort out."
Hicks, 533 U.S. at 383-85 (emphasis added).

Although the Supreme Court in Carcieri stated that some tribes were wrongly left off that list, 555 U.S. at 398, 129 S.Ct. 1058, it also has been said that, "[a]s a practical matter, this can be said to be the constructive 'list' of Indian tribes recognized by the United States in 1934." W. Quinn, Federal Acknowledgment of American Indian Tribes: The Historical Development of a Legal Concept, 34 Am. J. Legal Hist. 331, 356 (1990) (also cited in Carcieri ).

It has been said that "every Indian tribe could be considered 'under Federal jurisdiction' in some sense," Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell, 830 F.3d 552, 564 (D.C. Cir. 2016), but embracing that sense would undermine the essential purpose of the IRA's effort to place a limitation on the tribes that would qualify for the government's willingness to take additional lands in trust for their benefit. Clearly, the language at issue was meant as some kind of limiting principle. See also Carcieri, 555 U.S. at 392 (noting the petitioner's position that the IRA was intended to be "limited to tribes under federal jurisdiction at that time because they were the tribes who [had] lost their lands" under the government's previous allotment policy).

See, e.g., State v. $223,405.86, 203 So.3d 816, 830, 834-45 (Ala. 2016) (discussing elements and characteristics of "bingo" under various local amendments); Houston Cty. Econ. Dev. Auth. v. State, 168 So.3d 4, 9-18 (Ala. 2014) ; and State v. Greenetrack, Inc., 154 So.3d 940, 943-46, 959-60 (Ala. 2014).

Compare State v. Greenetrack, Inc., 154 So.3d at 959-60 (explaining that a statutory allowance for "an 'electronic marking machine' [does not] obviate[ ] all the other criteria" of the game commonly and traditionally known as bingo).

Nor do we find the Court's 1959 decision in Williams v. Lee, 358 U.S. 217, 223, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), to be contrary to the latter point. Although it involved a suit by a nonmember seeking to collect a business debt from a tribal member, which the Court held to be within the tribal court's jurisdiction, the nonmember was the owner and operator of a permanent general store licensed for operation on the reservation (out of which the debt arose) and, thus, had subjected himself to tribal laws in the same manner as any tribal member choosing to reside or own a business in Indian country. Application of general tribal law and adjudicatory authority in that context was necessary if the tribe was to have a right to engage in "self-governance," i.e., "to make their own laws and be ruled by them." See generally Hicks, supra. Cf. Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 139, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (holding that a tribe may exercise its sovereign taxing authority as to "petitioners [who] avail themselves of the 'substantial privilege of carrying on business' on the reservation," comparing them to a nonmember who takes up "residence" on tribal land). The alternative would mean that the subject-matter (versus personal) jurisdiction of a court over a dispute between a member and a nonmember would depend on who sues whom first and, furthermore, would be an unworkable paradigm in a dispute entailing multiple counterclaims, cross-claims, and/or third-party claims between various combinations of members and nonmembers. Ultimately, however, for purposes of this case, because the record does not reveal whether the individual defendants are or are not tribal members, we must consider whether the judgment of dismissal was appropriate assuming we have here a dispute only between nonmembers.