PER CURIAM.
The Court today decides three appeals involving similar issues of Indian tribal immunity and subject-matter jurisdiction in relation to claims of wrongful conduct by the Poarch Band of Creek Indians ("the Tribe") and business entities wholly owned by the Tribe. See Rape v. Poarch Band of Creek Indians, 250 So.3d 547 (Ala. 2017), and Wilkes v. PCI Gaming Authority, [Ms. 1151312, September 29, 2017] --- So.3d ---- (Ala. 2017). In the present case, Amada Harrison appeals the Escambia Circuit Court's dismissal, based on the doctrine of tribal immunity, of her complaint alleging that PCI Gaming Authority d/b/a Creek Entertainment Center; Wind Creek Casino and Hotel ("Wind Creek"); Creek Indian Enterprises, LLC; and the Tribe (hereinafter referred to collectively as "the *25 tribal defendants") were responsible for the death of her son Benjamin.
Benjamin was injured during the early morning hours of March 1, 2013, when, as a passenger, he was involved in an automobile accident following a high-speed police chase on a portion of a county roadway that traverses land held by the Tribe in Escambia County.[1] The driver of the vehicle in which Benjamin was a passenger, Roil Hadley, had consumed alcohol while he was a patron at Wind Creek during the evening of February 28, 2013, and the early morning hours of March 1, 2013.
On May 16, 2013, Harrison, as mother and next friend of Benjamin, sued the tribal defendants and two individuals, Lee Fountain and Kaweta Coon (hereinafter referred to collectively as "the defendants").[2] The complaint alleged that the tribal defendants were responsible for negligently or wantonly serving alcohol to Hadley despite his being visibly intoxicated and asserted, among other claims, claims against the tribal defendants under Alabama's Dram Shop Act, § 6-5-71, Ala. Code 1975.
On June 21, 2013, the defendants filed a motion to dismiss the complaint. In their motion, the defendants argued that they were protected from liability by the doctrine of tribal sovereign immunity, that the circuit court lacked subject-matter jurisdiction because the Tribe's court possessed exclusive jurisdiction over Harrison's claims, and that Harrison's claims against Fountain and Coon were due to be dismissed for failing to state a cause of action against them. On October 7, 2013, the circuit court granted the motion to dismiss as to the tribal defendants "based on the sovereign immunity of these defendants"; it denied the motion as to Fountain and Coon. On October 16, 2013, the circuit court certified its judgment of dismissal as final pursuant to Rule 54(b), Ala. R. Civ. P., and stayed the case as to Fountain and Coon. Harrison appealed.
While this appeal was pending, Benjamin died as a result of the injuries he sustained in the accident. Subsequently, Harrison filed a suggestion of death and a motion to substitute Harrison, as the administrator of Benjamin's estate, as the proper party in this action.
Standard of Review
"In Newman v. Savas, 878 So.2d 1147 (Ala. 2003), this Court set forth the standard of review of a ruling on a motion to dismiss for lack of subject-matter jurisdiction:
" 'A ruling on a motion to dismiss is reviewed without a presumption of correctness. Nance v. Matthews, 622 So.2d 297, 299 (Ala. 1993). This Court must accept the allegations of the complaint as true. Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C., 828 So.2d 285, 288 (Ala. 2002). Furthermore, in reviewing a ruling on a motion to dismiss we will not consider whether the pleader will ultimately prevail but whether the pleader may possibly prevail. Nance, 622 So.2d at 299.'
" 878 So.2d at 1148-49."
Hall v. Environmental Litig. Grp., P.C., 157 So.3d 876, 879 (Ala. 2014).
Discussion
The three appeals concerning the Tribe and/or its related entities that this Court *26 decides today present two intertwined issues: (i) the adjudicative jurisdiction, or what is usually referred to simply as the "subject-matter jurisdiction," of the tribal and state courts over this dispute and (ii) the alleged sovereign immunity of the tribal defendants. Both issues are grounded in the same fundamental principles regarding the nature of sovereignty and in corollary notions as to the reach of a sovereign's adjudicative authority and the extent of its immunity, as discussed in our opinion issued today in another of the three appeals. See Rape, 250 So.3d at 553-55 (Part III.B.). Unlike the trial court in Rape, the circuit court in this case issued an opinion stating a reason for its decision to dismiss the plaintiff's complaint: sovereign immunity. We therefore turn first to that issue.
Meaningful United States Supreme Court jurisprudence regarding tribal "sovereign immunity" dates back only 20 to 30 years, specifically to the 1991 case of Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), and to the 1998 case of Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc., 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).
Three earlier cases are sometimes referenced as seminal, the earliest of these being Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), but the Court's opinion, written by Chief Justice Marshall, did not address the issue of immunity. To the contrary, the case held that the Indian tribes were not the equivalent of foreign nations (and therefore could not sue in federal court under the constitutional provision authorizing "foreign states" to access federal courts under certain circumstances). See Cherokee Nation, 30 U.S. (5 Pet.) at 18-19.
Turner v. United States, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919), is more commonly referred to as the seminal case recognizing tribal sovereign immunity. But the case simply did not do this. Instead, it made clear that the tribe avoided liability in that case because it actually had been dissolved, Turner, 248 U.S. at 358, and because the law recognized no cause of action against the tribe for failing to prevent some tribal members from vandalizing the property of other tribal members. The only mention of "immunity" was to explain what was not the reason for its decision.
The last of the three earlier cases sometimes mistakenly referenced as providing the foundation for tribal immunity is the 1940 case of United States v. United States Fidelity & Guaranty Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (" U.S.F. & G."). U.S.F. & G., however, provides no substantive discussion of the issue. Sovereign immunity is merely assumed, with no reference to any Supreme Court precedent other than bare citations to Cherokee and Turner. See 309 U.S. at 512-13 and notes 10 and 1. The case involved a contract claim by a mining company on a contract it had negotiated with a representative of the tribes.[3]
*27 In Oklahoma Tax Commission, the Supreme Court did suggest that the doctrine of tribal sovereign immunity was "originally enunciated" in Turner, before noting that it has been reiterated in other cases. 498 U.S. at 510. Again, however, the Court's opinion offers no substantive rationale for the doctrine or its genesis. For the first time, however, the Court in Oklahoma Tax Commission did offer a rationale for persisting in the doctrine. The Court explained that it was unwilling to alter or abandon the doctrine because, in the years since the Court had previously referenced it, Congress had not acted to alter or eliminate it. Still, the Court acknowledged that
"Oklahoma ... urges this Court to construe more narrowly, or abandon entirely, the doctrine of tribal sovereign immunity.... At the very least, Oklahoma proposes that the Court modify [ U.S.F. & G. ], because trib al business activities such as cigarette sales are now so detached from traditional tribal interests that the tribal-sovereignty doctrine no longer makes sense in this context. The sovereignty doctrine, it maintains, should be limited to the tribal courts and the internal affairs of tribal government, because no purpose is served by insulating tribal business ventures from the authority of the States to administer their laws."
498 U.S. at 510 (emphasis added). The Court declined Oklahoma's invitation, again based solely on the "Congressional-inaction" rationale.[4]
This brings us to 1998 and the Court's decision in Kiowa Tribe of Oklahoma. In the same mode as previous decisions, Kiowa upheld the doctrine of tribal immunity, focusing on the inaction of Congress. In so doing, however, the Court's opinion was unique in its own self-criticism and self-doubt, both as to the propriety of the result being achieved and how its jurisprudence had come to that point.
The majority opinion in Kiowa starts with a confession as to the weakness of the precedents upon which it relied, noting that those precedents "rest on early cases that assumed immunity without extensive reasoning." 523 U.S. at 753. The majority in Kiowa candidly conceded that the doctrine of tribal immunity "developed almost by accident," 523 U.S. at 756 (emphasis added). As the Court explained:
"The doctrine is said by some of our own opinions to rest on the Court's opinion in Turner v. United States, 248 U.S. 354 (1919). See, e.g., [Oklahoma Tax Comm'n v. Citizen Band] Potawatomi [Indian Tribe of Oklahoma, 498 U.S. 505] at 510 [ (1991) ]. Though Turner is indeed cited as authority for the immunity, examination shows it simply does not stand for that proposition.... The Court stated: 'The fundamental obstacle to recovery is not the immunity of a sovereign to suit, but the lack of a substantive right to recover the damages resulting from failure of a government or its officers to keep the peace.' Id., at 358. 'No such liability existed by the general law.' Id., at 357.
"The quoted language is the heart of Turner. It is, at best, an assumption of immunity for the sake of argument, not a reasoned statement of doctrine. One cannot even say the Court or Congress *28 assumed the congressional enactment was needed to overcome tribal immunity. There was a very different reason why Congress had to pass the Act [of 1908, authorizing claims against the Creek Nation]: 'The tribal government had been dissolved. Without authorization from Congress, the Nation could not then have been sued in any court; at least without its consent.' Id., at 358. The fact of tribal dissolution, not its sovereign status, was the predicate for the legislation authorizing suit. Turner, then, is but a slender reed for supporting the principle of tribal sovereign immunity."
523 U.S. at 756-57 (emphasis added).
Despite the fundamental deficiencies in precedent and rationale recognized by the Court itself, the majority in Kiowa nonetheless chose to adhere to the doctrine, expressly "declin[ing] to revisit our case law and choos[ing] to defer to Congress," which the Court noted had chosen not to act in this area. 523 U.S. at 760, 118 S.Ct. 1700. Further still, it overlooked the fact that, because the doctrine itself is of judicial creation, Bay Mills, 572 U.S. at ----, 134 S.Ct. at 2045 (Scalia, J., dissenting), it is in a category where the dubious notion of "legislation by silence" has its weakest rationale. See, e.g., United States v. Wells, 519 U.S. 482, 496, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (observing that the Supreme Court has " 'frequently cautioned that "[i]t is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law" ' " (quoting NLRB v. Plasterers' Local Union No. 79, 404 U.S. 116, 129-30, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971), quoting in turn Girouard v. United States, 328 U.S. 61, 69, 66 S.Ct. 826, 90 L.Ed. 1084 (1946) )); Star Athletica, L.L.C. v. Varsity Brands, Inc., 580 U.S. ----, 137 S.Ct. 1002, 1015, 197 L.Ed.2d 354 (2017) (noting that " '[c]ongressional inaction lacks persuasive significance' in most circumstances" (quoting Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) )).
Finally, the Kiowa Court expressed concerns as to the propriety and fairness of perpetuating the doctrine of tribal sovereign immunity in modern times, and on that basis even went so far as to suggest, as we note today in Wilkes, --- So.3d at ----, that there might be "a need to abrogate" it:
"The doctrine of tribal immunity came under attack a few years ago in [Oklahoma Tax Commission v. Citizen Band] Potawatomi [Indian Tribe ofOklahoma, 498 U.S. 505 (1991) ]. The petitioner there asked us to abandon or at least narrow the doctrine because tribal businesses had become far removed from tribal self-governance and internal affairs. We retained the doctrine, however, on the theory that Congress had failed to abrogate it in order to promote economic development and tribal self-sufficiency. Id., at 510. The rationale, it must be said, can be challenged as inapposite to modern, wide-ranging tribal enterprises extending well beyond traditional tribal customs and activities. Justice Stevens, in a separate opinion, criticized tribal immunity as 'founded upon an anachronistic fiction' and suggested it might not extend to off-reservation commercial activity. Id., at 514-15 (concurring opinion).
"There are reasons to doubt the wisdom of perpetuating the doctrine. At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect nascent tribal governments from encroachments by States. In our interdependent and mobile society, *29 however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. See Mescalero Apache Tribe v. Jones, 411 U.S. 145 (1973) ; Potawatomi, supra ; Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.
"These considerations might suggest a need to abrogate tribal immunity, at least as an overarching rule. Respondent does not ask us to repudiate the principle outright, but suggests instead that we confine it to reservations or to noncommercial activities. We decline to draw this distinction in this case, as we defer to the role Congress may wish to exercise in this important judgment.
"....
"In light of these concerns, we decline to revisit our case law and choose to defer to Congress. Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation. Congress has not abrogated this immunity, nor has petitioner waived it, so the immunity governs this case...."
523 U.S. at 757-60 (emphasis added).
As we do in Wilkes, we take particular note of the Court's comment that tribal sovereign immunity especially hurts those "who have no choice in the matter." 523 U.S. at 758. We note as well the Court's limitation of its holding in Kiowa to "suits on contract." 523 U.S. at 760.
In a dissenting opinion in Kiowa, Justice Stevens echoed the majority's criticisms of its own decision. He offered an organized and insightful affirmation of the "accidental" "development" of tribal-immunity law, including the inappositeness of tribal immunity to modern tribes and the unfairness it creates for tort victims and others who have "no opportunity to negotiate for a waiver" through "voluntary contractual relationships." 523 U.S. at 766.[5]
*30 Justice Stevens concluded his opinion with "compelling reasons [that] favor the exercise of judicial restraint," including this final one:
"[T]he rule is unjust. This is especially so with respect to tort victims who have no opportunity to negotiate for a waiver of sovereign immunity; yet nothing in the Court's reasoning limits the rule to lawsuits arising out of voluntary contractual relationships. Governments, like individuals, should pay their debts and should be held accountable for their unlawful, injurious conduct."
523 U.S. at 764-66 (emphasis added).
Sixteen years after Kiowa, in his dissent in Michigan v. Bay Mills Indian Community, 572 U.S. 782, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014), Justice Thomas reviewed circumstances and cases he believed had served in the intervening years to highlight the unfairness of the Kiowa decision:
"In the 16 years since Kiowa, the commercial activities of tribes have increased dramatically. This is especially evident within the tribal gambling industry. Combined tribal gaming revenues in 28 States have more than tripled-from $8.5 billion in 1998 to $27.9 billion in 2012. National Indian Gaming Commission, 2012 Indian Gaming Revenues Increase 2.7 Percent (July 23, 2013), online at http://www.nigc.gov/ LinkClick.aspx?fileticket=Fhd5shyZ1fM%3D[6] ... But tribal businesses extend well beyond gambling and far past reservation borders. In addition to ventures that take advantage of on-reservation resources (like tourism, recreation, mining, forestry, and agriculture), tribes engage in 'domestic and international business ventures' including manufacturing, retail, banking, construction, energy, telecommunications, and more. Graham, An Interdisciplinary Approach to American Indian Economic Development, 80 N.D. L. Rev. 597, 600-604 (2004). Tribal enterprises run the gamut: they sell cigarettes and prescription drugs online; engage in foreign financing; and operate greeting cards companies, national banks, cement plants, ski resorts, and hotels. Ibid.; see also, e.g., The Harvard Project on American Indian Economic Development, The State of the Native Nations 124 (2008) (Ho-Chunk, Inc., a tribal corporation of the Winnebago Tribe of Nebraska, operates 'hotels in Nebraska and Iowa,' 'numerous retail grocery and convenience stores,' a 'tobacco and gasoline distribution company,' and 'a temporary labor service provider'); Four Fires, San Manuel Band of Mission Indians, http://www. sanmanuel-nsn.gov/fourfires.php.html[6] (four Tribes from California and Wisconsin jointly own and operate a $43 million hotel in Washington, D.C.). These manifold commercial enterprises look the same as any other-except immunity renders the tribes largely litigation-proof.
"As the commercial activity of tribes has proliferated, the conflict and inequities brought on by blanket tribal immunity have also increased. Tribal immunity significantly limits, and often extinguishes, the States' ability to protect their citizens and enforce the law against tribal businesses. This case is but one example: No one can seriously dispute that Bay Mills' operation of a *31 casino outside its reservation (and thus within Michigan territory) would violate both state law and the Tribe's compact with Michigan. Yet, immunity poses a substantial impediment to Michigan's efforts to halt the casino's operation permanently. The problem repeats itself every time a tribe fails to pay state taxes, harms a tort victim, breaches a contract, or otherwise violates state laws, and tribal immunity bars the only feasible legal remedy. Given the wide reach of tribal immunity, such scenarios are commonplace. See, e.g., Oneida Indian Nation of New York v. Madison Cty., 605 F.3d 149, 163 (C.A.2 2010) (Cabranes, J., joined by Hall, J., concurring) ('The holding in this case comes down to this: an Indian tribe can purchase land (including land that was never part of a reservation); refuse to pay lawfully-owed taxes; and suffer no consequences because the taxing authority cannot sue to collect the taxes owed'); see also Furry v. Miccosukee Tribe of Indians of Fla., 685 F.3d 1224 (C.A.11 2012) (Tribe immune from a suit arising out of a fatal off-reservation car crash that alleged negligence and violation of state dram shop laws); Native American Distributing v. Seneca-Cayuga Tobacco Co., 546 F.3d 1288 (C.A.10 2008) (tribal officials and a tobacco-products manufacturer were immune from a suit brought by a national distributor alleging breach of contract and interstate market manipulation); Tonasket v. Sargent, 830 F.Supp.2d 1078 (E.D. Wash. 2011) (tribal immunity foreclosed an action against the Tribe for illegal price fixing, antitrust violations, and unfair competition), aff'd, 510 Fed.Appx. 648 (C.A.9 2013) ; Multimedia Games, Inc. v. WLGC Acquisition Corp., 214 F.Supp.2d 1131 (N.D. Okla. 2001) (tribal immunity barred a suit alleging copyright infringement, unfair competition, breach of contract, and other claims against a tribal business development agency).
"In the wake of Kiowa, tribal immunity has also been exploited in new areas that are often heavily regulated by States. For instance, payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality. Martin & Schwartz, The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk? 69 Wash. & Lee L. Rev. 751, 758-759, 777 (2012). Indian tribes have also created conflict in certain States by asserting tribal immunity as a defense against violations of state campaign finance laws. See generally Moylan, Sovereign Rules of the Game: Requiring Campaign Finance Disclosure in the Face of Tribal Sovereign Immunity, 20 B.U. Pub. Interest L.J. 1 (2010).
"In sum, any number of Indian tribes across the country have emerged as substantial and successful competitors in interstate and international commerce, both within and beyond Indian lands. As long as tribal immunity remains out of sync with this reality, it will continue to invite problems, including de facto deregulation of highly regulated activities; unfairness to tort victims; and increasingly fractious relations with States and individuals alike."
572 U.S. at ----, 134 S.Ct. at 2050-52 (Thomas, J., dissenting) (footnote omitted; emphasis added). Cases and scenarios such as those described above led one of the concurring Justices in Kiowa to confess that he had seen enough and to opine that the *32 Court, with his concurrence, had made a "glaringly obvious" "mess" and that it was up to the Court to clean it up. Bay Mills, 572 U.S. at ----, 134 S.Ct. at 2045 (Scalia, J., dissenting).
Nonetheless, over the strenuous dissents of Justices Scalia, Thomas, Ginsburg, and Alito, the Supreme Court in Bay Mills declined to overrule Kiowa on the facts it had before it. The majority in Bay Mills began with the following statement: "Indian tribes are ' "domestic dependent nations" ' that exercise 'inherent sovereign authority.' " Bay Mills, 572 U.S. at ----, 134 S.Ct. at 2030 (quoting Oklahoma Tax Commission, 498 U.S. at 509, quoting in turn Cherokee Nation, supra). From there, the majority yet again deferred to congressional inaction as a rationale for perpetuating the jurisprudence of tribal immunity. As against this rationale, however, the Court did note that it had never employed the doctrine against one who had no alternative to judicial relief, see 572 U.S. at ---- n.8, 134 S.Ct. at 2036 n.8, indicating that it understood the potential unfairness of that circumstance. Bay Mills did not involve such a plaintiff.[7]
In concert with its reliance on congressional inaction, the main opinion in Bay Mills relied heavily on the doctrine of stare decisis. In so doing, however, it described Kiowa as a decision in which the Court had declined "to make any exception for suits arising from a tribe's commercial activities." 572 U.S. at ----, 134 S.Ct. at 2031. Further, in an effort to validate it reliance on stare decisis, it advanced for the first time these notions: that prior decisions like Kiowa could be taken into account by those "negotiating their contracts and structuring their transactions" with tribes and that, "[a]s in other cases involving contract and property rights, concerns of stare decisis are thus 'at their acme.' " 572 U.S. at ----, 134 S.Ct. at 2036 (emphasis added). See also Wilkes, --- So.3d at ---- (to same effect).
In the same vein, the Court in Bay Mills opined that congressional inaction had confirmed an intent "to retain tribal immunity (at least for now ) in a case like this one," 572 U.S. at ----, 134 S.Ct. at 2039 (emphasis added), which apparently is a reference to a case brought by a state or other party with the ability to negotiate a waiver or otherwise protect its interests in some of the other ways, which the Court described as available to Michigan.
Finally, the Court also offered that none of its off-reservation, tribal-immunity cases had ever involved "a tort victim" or other plaintiff "who has no alternative way to obtain relief" and that such a case might provide a reason for a different outcome:
"Adhering to stare decisis is particularly appropriate here given that the State, as we have shown, has many alternative remedies: It has no need to sue the Tribe to right the wrong it alleges. See supra, at 2034-2035. We need not consider whether the situation would be different if no alternative remedies were available."
572 U.S. at ---- n.8, 134 S.Ct. at 2036 n.8 (emphasis added).
As indicated, Justice Thomas's impassioned dissent expounded upon the themes *33 that the Court's expansion of tribal immunity in Kiowa, reiterated in Bay Mills, was "unsupported by any rationale for that doctrine, inconsistent with the limits on tribal sovereignty, and an affront to state sovereignty." 572 U.S. at ----, 134 S.Ct. at 2045 (Thomas, J., dissenting). Justice Thomas observed:
"[ Kiowa ], wrong to begin with, has only worsened with the passage of time. In the 16 years since Kiowa, tribal commerce has proliferated and the inequities engendered by unwarranted tribal immunity have multiplied. Nevertheless, the Court turns down a chance to rectify its error. Still lacking a substantive justification for Kiowa's rule, the majority relies on notions of deference to Congress and stare decisis. Because those considerations do not support (and cannot sustain) Kiowa's unjustifiable rule and its mounting consequences, I respectfully dissent."
572 U.S. at ----, 134 S.Ct. at 2045-46 (Thomas, J., dissenting).
Justice Thomas's dissent was grounded in the intrinsic attributes of sovereignty and sovereign immunity described in our decision today in Rape, 250 So.3d at 553-55 (Part III.B.), as well as many of the concerns expressed by commentators and courts in the wake of Kiowa. See, e.g., Bay Mills, 572 U.S. at ----, 134 S.Ct. at 2045-55 (Thomas, J., dissenting).
Reflecting the concerns expressed above, and in the interest of justice, this Court today in the case of Wilkes, supra, declines to extend the doctrine of tribal immunity to actions in tort, in which the plaintiff has no opportunity to bargain for a waiver and no other avenue for relief. Based on the foregoing and on our holding in Wilkes, we similarly conclude that the judgment entered by the trial court in the present case-extending to the tribal defendants immunity from responsibility for the life-ending injuries to Benjamin allegedly caused by their negligent or wanton serving of alcohol to a visibly intoxicated patron-is due to be reversed. We remand this case to the circuit court to take up the related issue, which was not addressed by the circuit court, of the asserted lack of adjudicative, or "direct" subject-matter, jurisdiction by the circuit court. In so doing, we note that the tribal defendants take the position that the claim in this case arose on Indian land. According to the complaint, however, Benjamin's life-ending injuries occurred on Jack Springs Rd., which is Escambia County Road 1, a fact that may bear on the whether adjudicative authority over this case lies in tribal or state courts. Compare Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).
In addition, on remand, the circuit court should consider whether subject-matter jurisdiction is affected by the fact that the alleged tortious conduct of the tribal defendants entails a violation of Alabama's statutory and regulatory scheme for the sale of alcohol in Alabama,[8] a scheme to which Congress has expressly declared the Tribe to be subject. See 18 U.S.C. § 1611.
*34 See generally Ala. Code 1975, Title 28 (including § 28-10-5 (requiring the Alabama Alcoholic Beverage Control Board ("the ABC Board") to receive proof annually of, and to certify annually, the compliance by licensees with "the requirements of this chapter," including so-called "dram shop" regulations) and § 28-3A-24 (providing for hearings and adjudications by the ABC Board of violations of Alabama's statutory and regulatory licensing scheme, subject to review in state courts)); Ala. Admin. Code (ABC Board), including Regs. 20-X-2-.03, 20-X-5-.14 and 20-X-6-.02(4) (making unlawful "on-premises" sales to visibly intoxicated patrons); Ala. Code 1975, § 6-5-71 (providing for private civil-enforcement actions for damages based the sale of liquors or alcoholic beverages "contrary to the provisions of law"). Compare Rice v. Rehner, 463 U.S. 713, 724, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983) (holding that 18 U.S.C. § 1161 is an express congressional enactment that "divested the Indians" of power to regulate in the arena of alcohol sales and that, as to such regulation, Indians do not "possess the ususal accoutrements of tribal self-government"); see also Bittle v. Bahe, 192 P.3d 810, 823 (Okla. 2008) (upholding state court jurisdiction over a dram-shop action brought as part of the "extant jurisprudence" under Oklahoma's "comprehensive statutory scheme" regarding the sale of alcohol and, "[c]onsistent with Rice v. Rehner, ... reject[ing] the Tribe's argument that [ 18 U.S.C.] § 1161 does not authorize the state courts to exercise jurisdiction over the Tribe"), and Cossey v. Cherokee Nation Enters., LLC, 212 P.3d 447, 456 (Okla. 2009) (holding that a tribal court is not a court of general jurisdiction and that "[i]ts jurisdiction could be asserted in matters involving non-Indians only when their activities on Indian lands are activities that may be regulated by the Tribe"), both cases overruled by Sheffer v. Buffalo Run Casino, PTE, Inc., 315 P.3d 359 (Okla. 2013). See also our opinion released today in Rape, 250 So.3d at 553-54 (discussing, inter alia, Nevada v. Hicks, 533 U.S. 353, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), and the fact that the exercise of tribal powers, even as to matters of "tribal self-government" and "internal relations," is subject to express congressional enactments, as well as the natural correlation between adjudicative authority and regulatory authority).
Conclusion
For the foregoing reasons, the circuit court's judgment of dismissal is reversed and this cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
Bolin, Parker, Murdock, Wise, Bryan, and Sellers, JJ., concur.
Stuart, C.J., and Main, J., concur in the result.
Shaw, J., recuses himself.

The record indicates that the accident occurred on "Jack Springs Rd.," which is County Road 1.

Harrison's complaint alleges that Fountain and Coon are Poarch Creek Indian police officers employed by the Poarch Band of Creek Indians.

Between the Court's decision in U.S.F. & G. and its 1991 opinion in Oklahoma Tax Commission, two decisions stating that tribes are entitled to "sovereign immunity" were decided by the Supreme Court. But again, the Court offered no substantive discussion in support of the doctrine in either case but, instead, simply presumed it as a fact. Thus, in Puyallup Tribe, Inc. v. Department of Game of Washington, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), the Court cited U.S.F. & G., but did not discuss the matter. And in Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), the Court similarly cited Turner, U.S.F. & G., and Puyallup in stating that the doctrine had previously been recognized.

In a special concurrence, Justice Stevens pointedly wrote that "[t]he doctrine of sovereign immunity is founded upon an anachronistic fiction." 498 U.S. at 514 (Stevens, J., dissenting) (citing Nevada v. Hall, 440 U.S. 410, 414-16, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979) ).

Justice Stevens's dissent was grounded in an appreciation of the intrinsic nature of sovereignty and sovereign immunity, see Rape, 250 So.3d at 553-55 (Part III.B.), and of how the doctrine of tribal immunity as recognized by the Court is disconsonant with that nature, with essential traditions of the common law, and with the sovereign authority of states in our American system of federalism. Among other things, Justice Stevens explained:
" 'The doctrine of sovereign immunity is an amalgam of two quite different concepts, one applicable to suits in the sovereign's own courts and the other to suits in the courts of another sovereign.' Nevada v. Hall, 440 U.S. 410, 414 (1979). In the former category, the sovereign's power to determine the jurisdiction of its own courts and to define the substantive legal rights of its citizens adequately explains the lesser authority to define its own immunity. Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907). The sovereign's claim to immunity in the courts of a second sovereign, however, normally depends on the second sovereign's law. Schooner Exchange v. McFaddon, 7 Cranch 116 (1812). An Indian tribe's assertion of immunity in a state judicial proceeding is unique because it implicates the law of three different sovereigns: the tribe itself, the State, and the Federal Government."
523 U.S. at 760-61 (Stevens, J., dissenting). Justice Stevens repeats the majority's concession that "the doctrine of tribal immunity from judicial jurisdiction 'developed almost by accident' " and reviews in detail the lack of a rationale for the doctrine in the two cases to which "[i]ts origin is attributed"-Turner and U.S.F. & G. Id. at 761.

On the date this opinion was released, these Web sites could no longer be accessed on the Internet.

The Court also took note of a few statutes over the years in which Congress had referenced the immunity doctrine, see Bay Mills, 572 U.S. at ---- n.11, 134 S.Ct. at 2039 n.11 (listing some statutes and citing Potawatomi, 498 U.S. at 510, for others), but none, as Justice Thomas countered, in which Congress had itself affirmatively legislated the existence of the doctrine, 572 U.S. at ----, 134 S.Ct. at 2052 (Thomas, J., dissenting) ("To this day, Congress has never granted tribal sovereign immunity in any shape or form ....").

Following the filing of the parties' initial briefs in this case, this Court in a separate case rejected a challenge to a decision of the Montgomery Circuit Court declining to apply the doctrine of tribal sovereign immunity to the Tribe or to PCI Gaming Authority in a dram-shop action. See Ex parte Poarch Band of Creek Indians, 155 So.3d 224 (Ala. 2014) (no opinion, but with special writing). In her reply brief, Harrison makes note of this decision, including Chief Justice Moore's special concurrence, 155 So.3d at 225, examines the State statutory and regulatory scheme governing the sale of alcohol within the State of Alabama, and asks this Court to remand the case to the circuit court to reconsider the jurisdictional issue of tribal sovereign immunity in light of the same. The need for a such a remand as to the issue of immunity per se is pretermitted by our decision today in Wilkes, but in light of the concerns raised by Harrison and given the intertwined, jurisdictional nature of both issues, the circuit court on remand should consider Alabama's statutory and regulatory scheme for the licensing of alcoholic-beverage sales as it relates to the issue of tribal adjudicatory authority.